IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
v.                              )       No. 3:16-CR-20-CLC-HBG
                                )
SCOTT WOMBOLD, and              )
HEATHER JONES,                  )
                                )
            Defendants.          )


**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. On March 24, 2017, this case came before the undersigned

for an evidentiary hearing on Defendant Scott Wombold's Motion to Suppress Statements [Doc.

132] and the Motion to Suppress Oral Statements Made by Defendant Heather Jones [Doc. 134],

both filed on February 8, 2017. Assistant United States Attorney Francis M. Hamilton, III,

appeared on behalf of the Government. Attorneys Eli Richardson, John E. Kelly, and Robert K.

Platt appeared for Defendant Wombold. Attorneys Benjamin J. Vernia and Cullen Michael Wojcik

represented Defendant Jones.[1] Defendants Wombold and Jones were also present. The Court has

considered the testimony of the witnesses, the exhibits, and the arguments of the parties in their

---

[1] The following counsel were also present for a status conference: Attorneys Anthony Douglas Drumheller and Jennifer E. Brevorka representing Defendant Mark Hazelwood; Attorneys Roger W. Dickson and Zachary H. Greene representing Defendant John Freeman; Attorneys Joseph E. Costner, Sarah Bean Smith, and Angela Snyder representing Defendant Vicki Borden; Attorney James P. Fleisher representing Defendant John Spiewak; Attorney Richard Lewis Tennent representing Defendant Katy Bibee; and Attorneys Jonathan D. Cooper and Sara E. Compher-Rice appeared on behalf of Defendant Mann.

1

filings. For the reasons set out below, the undersigned finds that Defendants Wombold and Jones were not in custody at the time they gave statements at Pilot headquarters on April 15, 2013. Accordingly, the *Miranda* warnings were not required. The Court recommends that the Defendants' motions be denied.

## I.    POSITIONS OF THE PARTIES

Defendants Scott Wombold and Heather Jones are charged [Doc. 98] with conspiracy to commit mail and wire fraud (Count One) between February 1, 2008, and April 2013. The Defendants, who were employed by Pilot Travel Centers LLC ("Pilot"), are alleged to have participated in a scheme to defraud trucking companies out of diesel fuel discounts to which the trucking companies were entitled by agreement with Pilot. These charges follow the execution of a search warrant at Pilot headquarters in Knoxville, Tennessee, on April 15, 2013. During the execution of the search warrant, both Scott Wombold and Heather Jones were interviewed by federal agents. It is these statements by Defendants Wombold and Jones that are the subject of their motions.

Defendants Wombold [Docs. 132-33 & 151] and Jones [Docs. 134-35 & 152] ask the Court to suppress their statements of April 15, 2013, because these statements were given in violation of the Fifth Amendment. They contend that the agents failed to advise them of their rights and interrogated them while they were in the functional equivalent of police custody. Both Defendants maintain that a reasonable person in his or her circumstances would not have felt free to leave. Defendant Wombold contends that agents ordered him to return to his office, where they questioned him for two hours, while numerous armed law enforcement officers conducted the

search just outside. He asserts that the agents yelled for him to keep his hands visible, denied him access to his cellular telephone, and never told him that he was free to leave. Defendant Jones argues that despite creating the illusion of noncustodial interrogation, the actual actions and tone of the agents were coercive and caused her to believe she was not free to leave. She maintains that she was made to stand with her hands on her head for thirty minutes before the forty-five-minute interrogation. She contends that the purpose of the interview was to get her to admit guilt, the place of questioning was hostile and coercive, the tone of the agents was accusatory, and that she lacked freedom of movement.

The Government responds [Docs. 144, 146 SEALED, 146-1 SEALED, & 156] that the *Miranda* warnings were not warranted for either Defendant Wombold's or Defendant Jones's interviews, because the Defendants were questioned at their place of employment, not while in custody. It argues that the circumstances of the interviews, which include the agents telling both Defendants that they were free to leave or to be interviewed elsewhere, were not coercive. The Government asserts that a reasonable person in these Defendants' positions would have felt free to leave.

## II.    SUMMARY OF THE TESTIMONY

At the March 24 hearing, the Government called six witnesses: Special Federal Bureau of Investigation ("FBI") Agent Andrew Fisher, Jennifer Dalmida, Special FBI Agent David Bukowski, Special Internal Revenue Service Criminal Investigation Division (IRS-CID) Agent Robert Masterson, Special FBI Agent Susanne Lee, and Special FBI Agent Joelle Vehec.

The Defendants both testified and also called two witnesses: Kevin Herman and Barbara Yarber. The Court summarizes the witnesses' testimony as follows:

Special Agent Andrew M. Fisher testified that he has been an FBI agent for twenty years and has participated in the execution of between seventy-five and one hundred search warrants. [Tr. at 18-19][2] He estimated that he had conducted hundreds of interviews over the course of his career, including interviews during the execution of a search warrant at an office. [Tr. at 19] Agent Fisher stated that in preparation for the execution of a search warrant at Pilot Flying J, at 5508 Lonas Drive, Knoxville, Tennessee ("Pilot headquarters"), on April 15, 2013, he and other FBI agents watched a YouTube video [Exh. 5] depicting a tour of two floors of the Pilot headquarters building. [Tr. at 20-21] He said the video gave them an idea of the number of employees, cubicles, and offices at Pilot, as well as the layout of the office space. [Tr. at 23]

Agent Fisher stated that also in preparation for executing the search warrant, the agents consulted the search warrant affidavit [Exh. 6], which states that the direct sales division is located on the top or third floor of the building. [Tr. at 26] He said the agents understood that a significant amount of electronic evidence would be found on the top floor and that the Pilot employees used a shared computer network. [Tr. at 26] Agent Fisher stated that a shared computer network required executing agents to locate all employees with access to the network in order to eliminate the possibility of someone going on the shared drive and destroying evidence. [Tr. at 28] He said the search warrant affidavit also revealed that Ashley Judd, an employee in Pilot's direct sales division, had expressed an intent to destroy evidence. [Tr. at 29] Agent Fisher testified

[2] The transcript [Doc. 177] of the March 24, 2017 evidentiary hearing was filed on April 13, 2017.

that agents learned that Holly Radford, who also worked in the direct sales division, had a firearm carry permit.  [Tr. at 30]

Agent Fisher stated that, during the execution of a search warrant at a business, the FBI routinely plans to conduct interviews of employees located on the premises.  [Tr. at 31]  He said agents planned to try to interview fourteen employees in Pilot's direct sales division during the search of Pilot headquarters.  [Tr. at 33]  He stated that two agents were assigned to conduct each interview and that he and Special IRS-CID Agent Robert Masterson were designated to interview Scott Wombold.  [Tr. at 33-35]  He said that he prepared to interview Wombold by reviewing the search warrant affidavit for references to him.  [Tr. at 35]

Agent Fisher testified that fifty-four federal agents began entering the middle or second floor of the Pilot headquarters building at 1:48 p.m. on April 15, 2013.  He stated that, aside from seven filter agents with special responsibilities, the first responsibility of the other agents was to locate all employees in order to ensure the safety of the agents and the employees and to ensure the preservation of the evidence.  [Tr. at 36]  He said that all of the agents were wearing windbreakers or "raid jackets," bearing their agency designation, over business attire.  [Tr. at 37-39]  Agent Fisher stated that the agents also wore soft body armor, which is made of Kevlar material and does not have protective metal plates in it.  [Tr. at 39-40]  He stated that the agents were armed with duty-issued side arms but did not carry long guns, tools for forced entry, ballistic shields, or rams for the door.  [Tr. at 41]  He said he did not see any agent remove his or her weapon from its holster or handcuff a Pilot employee during the execution of the search warrant.  [Tr. at 42]

Agent Fisher stated that upon entering Pilot headquarters, approximately twenty-five agents went to the east wing of the third floor, which contained the cubicles of the direct sales division surrounded by offices.  [Tr. at 44]  He said that in order to ensure safety and preserve evidence, the agents located the employees, had them stand up and step away from their computers, and had the employees place their hands in the air where the agents could see them.  [Tr. at 45, 51-52]  Around 1:55 p.m., Agents Fisher and Masterson located Scott Wombold standing in the hallway to the east of his office and adjacent to the cubicles.  [Tr. at 48-49]   Agent Fisher recognized Wombold from photographs and asked him if he was Scott Wombold.  [Tr. at 49]  When Wombold confirmed his identity, Agent Fisher said they "would really appreciate . . . him taking some time to talk to us and that we would like to talk to him because we believe that he had information that would assist us with our investigation."  [Tr. at 49]   Agent Fisher stated that Wombold agreed to talk to them but that they had to remain in the hallway for several minutes while the security team finished checking the offices for weapons.  [Tr. at 50]  In the meantime, Agents Fisher and Masterson were responsible for helping secure the area before the search began, and they asked Wombold to stand with them until they "got the situation under control."  [Tr. at 50]  They waited in the hallway with Wombold  for approximately ten minutes.  [Tr. at 51]

Agent Fisher testified that at approximately 2:05 p.m., he and Agent Masterson went with Wombold to his office.  [Tr. at 52]  He said that as they walked past the direct sales division, he saw that other agents had allowed the employees to lower their hands.  [Tr. at 53]  Agent Fisher described Wombold's office as containing a small circular table with two chairs underneath a white board hanging on the wall, a desk with a chair, two windows, and two chairs across from the desk.  [Tr. at 55]  When they entered the office, Wombold sat in the chair behind

his desk, and the agents sat in the two chairs across the desk from Wombold.  [Tr. at 57]  Agent Fisher stated that during the interview, Wombold had a path to the door of his office continually available, and the door was left open approximately six inches during the entire interview.  [Tr. at 56, 60-61]  Agent Fisher said, once they were seated, he explained to Wombold that the interview was voluntary and that he was not required or obligated to speak with the agents.  [Tr. at 59]  Agent Fisher told Wombold that he was not under arrest, was not going to be arrested, and would be allowed to go at the end of the interview.  [Tr. at 60]  Agent Fisher told Wombold that they could interview him at a location of his choosing, either there in his office or at a another location such as a restaurant.  [Tr. at 60]  Agent Fisher stated that he told Wombold that "the interview was completely voluntary" and that Wombold "could walk out that door any time he . . . so desired." [Tr. at 60]  He said that Wombold indicated that he understood he was free to leave and that Wombold said that he preferred to talk to the agents in his office.  [Tr. at 64]  Agent Fisher stated that he took notes during the interview and that he memorialized his discussion with Wombold about the interview being voluntary in an interview memorandum [Exh. 10].

Agent Fisher said that he wore professional attire during Wombold's interview but, by this time, he had taken off his jacket and body armor.  [Tr. at 64]  He said that during the interview, he did not unholster his gun, which was covered by his clothing.  [Tr. at 64-65]  He also stated that he did not handcuff Wombold or threaten to do so during the interview.  [Tr. at 65]

Agent Fisher stated that the substantive part of the interview of Wombold began around 2:15 p.m.  [Tr. at 63]  He said that at one point in the interview, he told Wombold that he thought Wombold was not being candid with the agents.  [Tr. at 66]  He said that his tone was respectful and professional when he said this to Wombold.  [Tr. at 66]  Agent Fisher said that when

the interview was "becoming more direct" and Agent Fisher was saying he did not believe Wombold, Wombold lowered his hands below the desk, where Agent Fisher could not see them. [Tr. at 67]  At that point, Agent Fisher stood and walked behind Wombold's desk to see where he was putting his hands.  [Tr. at 68]  After determining that Wombold did not have a weapon, Agent Fisher returned to his chair.  [Tr. at 68]

Agent Fisher testified that around 2:55 p.m. and after the agents had been speaking with Wombold for one-half hour, he offered to move to another location of Wombold's choosing. Agent Fisher said that during the entire interview, Wombold never asked to consult with an attorney, nor did he even mention an attorney.  [Tr. at 70]  Agent Fisher said that although Wombold received five telephone calls on his cellular telephone during the interview, he and Agent Masterson did not allow Wombold to answer four of those calls.[3] [Tr. at 70-71, 76]  He said that Wombold's cellular telephone was lying on his desk during the interview and, when the phone rang, the agents "indicated that we would prefer if he not take that phone call."  [Tr. at 71]  Agent Fisher said that Wombold agreed not to take the call.  [Tr. at 71]  Agent Fisher testified that Wombold's cellular telephone records from April 15, 2013 [Exh. 11] show that Wombold received a call from Mark Hazelwood at 1:54 p.m., a call from his wife at 3:11 p.m., and a second call from his wife at 3:45 p.m.  [Tr. at 73-74]  When Wombold's wife called him a second time, Wombold asked if he could speak to her, and the agents said "Yes."  [Tr. at 72]  Agent Fisher said that the interview ended at 4:03 p.m.  [Tr. at 76]  After the interview, Agents Fisher and Masterson escorted Wombold to the front door of the building.  [Tr. at 77]

---

[3] He said that if Wombold chose to cooperate, they did not want other people knowing that he had spoken to law enforcement.  [Tr. at 70]  Agent Fisher said they also did not want someone to discourage Wombold from talking with them, and they wanted to preserve the flow of the interview.  [Tr. at 70-71]

On cross-examination by counsel for Defendant Jones, Agent Fisher testified that he began planning for the execution of the search warrant two weeks before the search warrant was issued on April 11, 2013. [Tr. at 80-81] He stated that the search warrant permitted the agents to search for business records and that no arrest warrants were issued in conjunction with the search warrant. [Tr. at 81] Agent Fisher said his concerns in executing the search warrant were that Pilot be able to maintain continuity of operations, that a filter team review and cull out attorney-client privileged information, that employees and agents remain safe in light of the fact that two employees had gun carry permits, and that evidence be preserved in light of the networked computer system and Ashley Judd's stated inclination to destroy evidence. [Tr. at 82-83] Agent Fisher stated that none of the fourteen employees, whom the agents hoped to interview, had any criminal history. [Tr. at 84] Agent Fisher agreed that these concerns could have been allayed by executing the search warrant before business hours but explained that the instant search warrant could not be executed until after the execution of a search warrant for Brian Mosier's residence in Iowa. [Tr. at 83-84]. He said that he was not aware of the reasons for executing the search warrant for Mosier's residence at 1 p.m., rather than at 7 a.m. [Tr. at 85]

On cross-examination by counsel for Defendant Wombold, Agent Fisher testified that prior to the execution of the search warrant at Pilot, agents identified fourteen employees whom they would attempt to interview and that Wombold was on that list. [Tr. at 99] He said the agents were briefed that all employees would be free to leave, even though the operations plan specified that only the employees who were not on the interview list would be allowed to gather their things and then be escorted off the property. [Tr. at 100-101]

Agent Fisher said that during the execution of the search warrant at Pilot headquarters, the agents told people on the premises where they could and could not go, what they could and could not touch, and where they could place their hands. [Tr. at 89] He agreed that agents had the employees place their hands above their heads and that agents made it clear that they were executing a search warrant. [Tr. at 89-90, 92] He also agreed that the agents' instruction for the employees in the cubicle area to stand and move away from their desks was in the form of a firm command. [Tr. at 93] He said the agents told the employees not to touch their computers or any firearms. [Tr. at 94]

Agent Fisher said upon encountering Wombold, he confirmed Wombold's identity and then said, "We'd really appreciate it if you'd be willing to talk to us." [Tr. at 104-05] He said that he spoke to Wombold about the voluntariness of the interview for ten minutes, starting around 2:05 p.m. [Tr. at 86-87] He agreed that he did not record the time he encountered Wombold in the hall or the time the interview began on his notes made at the time of the interview. [Tr. at 87] Instead, his notes state that the interview started at 2:15 p.m. [Tr. at 88] Agent Fisher agreed that Wombold could not have made the agents leave his office during the execution of the search warrant, but he said that Wombold could have left. He agreed that his notes from the interview of Wombold do not state that he told Wombold that he was free to leave. [Tr. at 91] Agent Fisher confirmed that he was trained in the proper use of the *Miranda* warnings. [Tr. at 97] He said that he did not give the *Miranda* warnings to Wombold on April 15, 2013, because he was conducting a noncustodial interview. [Tr. at 97] He agreed that if he does not give the *Miranda* warnings during an interview, he should tell the person that they are free to leave. [Tr. at 97-98] He said

that he told Wombold that he was free to leave. [Tr. at 98] However, he agreed that Wombold would not have been allowed to go anywhere in the building without an agent. [Tr. at 105]

Agent Fisher agreed that he sat closer to the door to Wombold's office than Wombold did. [Tr. at 95] He acknowledged that Wombold could have seen agents passing by in the hallway because the door remained open about six inches during the interview. [Tr. at 95] He said that when Wombold lowered his hands below the top of his desk during the interview, he was concerned that Wombold might be reaching for a weapon. [Tr. at 96] He said before he went to the back of Wombold's desk to check for a weapon, he firmly told Wombold to show his hands, but he denied shouting this command. [Tr. at 96]

Agent Fisher said that he discouraged Wombold from answering calls on his cellular telephone during the interview. He said he did not recall whether he looked at the caller identification on the phone as the calls came in or he asked Wombold who was calling. [Tr. at 102] He agreed that he may have picked Wombold's phone up from the desk. [Tr. at 102] He said that while an attorney could have been calling, Wombold did not say that he was expecting a call from an attorney. [Tr. at 102-03] He said that Wombold did not ask to speak to an attorney during the interview. [Tr. at 103]

On redirect examination, Agent Fisher testified that the agents executing the search warrant at Pilot planned to interview approximately fourteen employees in the direct sales division and other employees not in that division. [Tr. at 106] Agent Fisher stated that when he first encountered Wombold, he identified himself and he was wearing an identifying jacket. [Tr. at 110] He said his notes made at the time he interviewed Wombold state "document voluntariness," "not under arrest," "can go elsewhere," and "door cracked six inches." [Tr. at 108] Agent Fisher

stated that his memorandum of the Wombold interview states that the "interviewers advised Wombold he could leave at any time and offered that he could meet the interviewers at an off-site location." [Tr. at 109]

On recross-examination, Agent Fisher denied that he wrote the statements about documenting voluntariness and that the interviewee can go elsewhere and was not under arrest in advance of the interview of Wombold. [Tr. at 111] He agreed that he wrote the approach time of "between 12:30 and 1:00 central time" on his notes beforehand but stated that the rest of his notes were contemporaneous with the interview, even though the notes on voluntariness were written above the approach time. [Tr. at 111-12] He stated that he may have written the items he wanted to cover with Wombold in his notes before the interview, but he said he made the checkmarks beside those items contemporaneously with the interview. [Tr. at 113] He agreed that the statement that Wombold was free to leave was not on the list of items relating to voluntariness in his notes. [Tr. at 114]

On additional redirect examination, Agent Fisher testified that the top part of his notes indicate his plan to ensure that the interview was voluntary. [Tr. at 117] He said that he planned to tell Wombold that he was free to leave and that he did tell Wombold that he was free to leave. [Tr. at 117] On additional cross-examination, Agent Fisher agreed that his plan to tell Wombold that he was free to leave was not documented in either the operations plan for the execution of the search warrant or on the top of the first page of his notes from the Wombold interview. [Tr. at 118]

Jennifer Dalmida testified that she works at Verizon Wireless. [Tr. at 119] She identified Scott Wombold's historical call detail records from April 2013 [Exh. 11] as Verizon

business records.  [Tr. at 120]  She explained that an "F" in the third column[4] of the records means that the receiving party did not take the call and that the call was forwarded to voice mail.  [Tr. at 121].  On cross-examination, Ms. Dalmida testified that the time for a call reported in the records is given in the time zone of the location of the receiving telephone.  [Tr. at 122]  On redirect examination, Ms. Dalmida said the duration of the call is given in seconds.  [Tr. at 123]

Special FBI Agent David Bukowski testified that he has worked as an FBI agent for fourteen years in Knoxville and five years in Texas.  [Tr. at 124-25]  He has participated in the execution of hundreds of search warrants, about ten percent of which were searches of businesses.  [Tr. at 125]  He participated in the search of Pilot headquarters on April 15, 2013.  [Tr. at 125]  Upon entering Pilot headquarters, Agent Bukowski proceeded to the "bull pen" or cubicle area for the direct sales division on the top floor.  [Tr. at 125-26]  Agent Bukowski testified that agents instructed employees to step away from their computers, to stay off of their work telephones and their cellular telephones, and to show their hands.  [Tr. at 126]  The agents used an authoritative voice but did not yell, remove their weapons from their holsters, or handcuff anyone.  [Tr. at 127]  He said the agents walked through the aisles between the cubicles making sure nothing dangerous was within reach of the employees.  [Tr. at 127]  He said the employees did not have their hands up for long.  [Tr. at 127]

Agent Bukowski stated that he was tasked with interviewing Ashley Judd.  [Tr. at 177]  Within minutes of entering the building, Agent Bukowski introduced himself to Judd, whose

---

[4] Although the witness stated this was the second column on the records, the Court finds that she was testifying to the records as they were displayed on the document camera, which cut off the first column. The Court finds that the witness was actually referring to the third column on page eight of Exhibit 11, because only the third column has an "F" as the final character of some of the entries.

cubicle was one row over and three down from Heather Jones's cubicle.  [Tr. at 129; Exh. 3, p.2]

He escorted Judd from her cubicle to Wendy Hamilton's office and began the interview of Judd at

2:05 p.m.  [Tr. at 130]  He stated that none of the employees' hands were raised at the time he left

the cubicle area with Judd.  [Tr. at 131]  Near the start of his interview of Judd, Agent Bukowski

returned to Judd's cubicle to retrieve some papers.  [Tr. at 132]  He stated that he did not recall

seeing any employees with their hands in the air at that time.  [Tr. at 133]

On cross-examination, Agent Bukowski testified that upon their entry into Pilot

headquarters, agents secured each area and told the employees what was happening.  [Tr. at 137]

He confirmed that the agents told the employees to back away from their desks and asked them to

show their hands.  [Tr. at 137-38]  He agreed that as long as the employees remained in the bull

pen, it was important for the agents to be able to see their hands.  [Tr. at 138]  He said that while

the employees in the bull pen may have been asked to raise their hands initially, once the scene

was secure, the employees sat or stood in their cubicles.  [Tr. at 134]  Agent Bukowski stated that

many of the employees had moved their chairs into the opening to the cubicles and sat facing the

aisles.  [Tr. at 138]  He said that both when he left the bull pen with Judd and when he returned to

the bull pen to retrieve some papers from Judd's cubicle, the employees' hands were not raised.

[Tr. at 135-36] He agreed that the agents had the authority to challenge any movements by an

employee that the agent did not like, but he did not know if this occurred.  [Tr. at 139]  He

acknowledged that it is important for agents to maintain control of the people on the scene during

the execution of the search warrant.  [Tr. at 141]  Agent Bukowski said that he did not know what

transpired during the interview of Scott Wombold.  [Tr. at 137]

Robert Masterson testified that at the time of the execution of the search warrant at Pilot headquarters on April 15, 2013, he was a special agent in the Internal Revenue Service Criminal Investigation Division and had served in that capacity for twenty-one years. [Tr. at 143-44] During the execution of the search warrant, Mr. Masterson was responsible for interviewing Scott Wombold. [Tr. at 144] He stated that he and Agent Fisher told Wombold that they would like to ask him some questions. [Tr. at 144] He said Wombold agreed to cooperate. [Tr. at 144]

Mr. Masterson said that he and Agent Fisher entered and sat down in Wombold's office. [Tr. at 145] He said they spent between two and ten minutes establishing a rapport with Wombold. [Tr. at 146] According to Mr. Masterson, the agents then told Wombold that he was not under arrest, that he was free to leave, and that he could speak to them in his office or at another location. [Tr. at 146] Mr. Masterson said that they told Wombold that they could talk at a restaurant or at his house, if he wanted, but Wombold chose to speak to them in his office. [Tr. at 146] Mr. Masterson stated that about halfway through the interview, the flow of the conversation slowed down, so the agents again offered to move to another location to complete the interview. [Tr. at 146] Mr. Masterson said that at that time, Wombold seemed to be "holding back" and not being forthcoming with his answers, and the agents thought that moving to another location away from the office would allow Wombold to speak more freely. [Tr. at 147] He said that Wombold chose to continue the interview in his office. [Tr. at 147] Mr. Masterson testified that Wombold never requested or mentioned a lawyer or requested a break during the interview. [Tr. at 149] On cross-examination, Mr. Masterson stated that the interview lasted approximately two hours and that the agents did not offer Wombold a break. [Tr. at 151]

Special Agent Susanne Lee testified that during the course of her fifteen-year career in the IRS-CID, she has participated hundreds of interviews and in the execution of thirty to fifty search warrants, including approximately twenty-five searches of office buildings. [Tr. at 152-53] On April 15, 2013, she assisted with the execution of a search warrant at Pilot headquarters in Knoxville, Tennessee. [Tr. at 153] She and FBI Agent Joelle Olszewski, now Agent Vehec, were responsible for interviewing Heather Jones. [Tr. at 153-54] Agent Lee said that she did not recall whether they located Jones at her desk or if another agent located Jones and introduced them. [Tr. at 153] When she first encountered Jones in the open area on the top floor of Pilot headquarters, Agent Lee introduced herself and explained that she and Agent Vehec would like to ask Jones some questions. [Tr. at 154] Agent Lee said she told Jones that she did not have to talk to them and, if Jones chose not to talk to them, she would be free to go. [Tr. at 154] Agent Lee said that Jones agreed to talk with the agents. [Tr. at 155]

Agent Lee stated that the agents and Jones then walked to an empty office on the third floor, where they could talk privately. [Tr. at 155-56] Agent Lee said the office contained one window. [Tr. at 156] Jones seated herself behind the desk, and the agents sat across from her in chairs facing the desk with the door to the office behind them. [Tr. at 156, 158] Agent Lee said she and Agent Vehec were dressed professionally. [Tr. at 158] She stated that she was armed but that her raid jacket covered her weapon. [Tr. at 158] Agent Lee said that neither she nor Agent Vehec removed their guns from their holsters during the interview. [Tr. at 159] She said that she did not handcuff Jones, nor did she threaten to do so. [Tr. at 159]

Agent Lee said that she and Agent Vehec conducted the interview with a professional demeanor, meaning they were calm and respectful. [Tr. at 159] She denied ever

telling Jones, "You all are bad" or attempting to intimidate Jones. [Tr. at 159] According to Agent Lee, Jones did not mention an attorney at any point in the interview. [Tr. at 162] When Agent Lee thought that Jones was not being completely truthful about the manual rebates, she advised Jones of 18 U.S.C. § 1001. [Tr. at 162] Agent Lee stated that the interview lasted approximately forty-five or fifty minutes, and Jones did not ask for a break or to leave. [Tr. at 159-60] At the end of the interview, Agent Lee explained to Jones that law enforcement was also interviewing other Pilot employees and asked if Jones wanted to clarify any of her answers or provide additional information. [Tr. at 162] Agent Lee said that Jones declined her offer and was allowed to leave. [Tr. at 160, 163] Agent Lee escorted Jones out of the building in order to assure everyone's safety and the preservation of evidence. [Tr. at 160].

On cross-examination, Agent Lee testified that at a briefing on the morning of April 15, 2013, she and Agent Vehec were assigned to interview Heather Jones. [Tr. at 164-65] She entered Pilot headquarters at 1:48 p.m. on that day and went directly to the top floor. [Tr. at 167] She did not recall an agent instructing the employees to place their hands on their heads or to remain silent. [Tr. at 168-69]. Agent Lee did not recall any employees raising their hands above or to their head while she was there. [Tr. at 168-69] Agent Lee said that the employees were instructed to step away from their desks, and the employees followed that instruction. [Tr. at 169] She stated that it took some time to determine which employees were the ones whom law enforcement wanted to interview. [Tr. at 169] She stated that those employees, who were not going to be interviewed, were told they were free to go, allowed to get their belongings, and escorted from the building. [Tr. at 169] She said that she did not know whether Jones was standing

for twenty minutes before she approached her.  [Tr. at 172]  She agreed that it was possible that another agent spoke with Jones before she and Agent Vehec spoke to her.  [Tr. at 178]

Agent Lee stated that when she first encountered Jones, either at her cubicle or in the hallway, she told Jones that she and Agent Vehec would like to talk to her, that they had some questions for her, that Jones did not have to talk to them, and that if she chose not to talk to them, she would be free to go.  [Tr. at 176-77]  She denied telling Jones, "You need to come with us[.]" [Tr. at 174].  Agent Lee agreed that her notes from the interview reflect that the interview began at 2:23 p.m. and ended at 3:16 p.m.  [Tr. at 173; Exh. 16]  Following the interview, she and Agent Vehec escorted Jones out of the building.  [Tr. at 177]  Agent Lee did not recall whether Jones had to retrieve her personal belongings first.  [Tr. at 177]

Agent Lee testified that she had no responsibility with regard to Scott Wombold and that she did not know what happened during his interview.  [Tr. at 179]  She said that 18 U.S.C. § 1001 makes it a felony to make a false statement on a matter within the jurisdiction of the executive branch.  [Tr. at 180-81]  She denied that she advised Jones of this statute in order to intimidate her.  [Tr. at 181]  Instead, she opined that advising a witness of this statute could be helpful, rather than intimidating.  [Tr. at 181]

Special FBI Agent Joelle Vehec testified that she has been an FBI agent for six years.  [Tr. at 184]  She said that on April 15, 2013, she participated in the execution of a search warrant at Pilot headquarters.  [Tr. at 184]  At that time, she went by her maiden name Olszewski. [Tr. at 185]  Agent Vehec stated that she and Agent Susanne Lee were assigned to interview Heather Jones.  [Tr. at 184]  They encountered Jones in a hallway on the third floor.  [Tr. at 185] Agent Vehec said she and Agent Lee introduced themselves, explained that speaking with them

18

was voluntary, and told her that she was free to leave.  [Tr. at 185]  She did not recall whether they told Jones that she was not under arrest.  [Tr. at 185-86]  Jones agreed to be interviewed, and they went to an office.  [Tr. at 186]  She denied that she or Agent Lee told Jones that "all of you are bad."  [Tr. at 186]  She said that Jones did not ask for a break during the interview.  [Tr. at 186]

On cross-examination, Agent Vehec stated that she entered Pilot headquarters with the other agents at 1:48 p.m.  [Tr. at 187]  She went up the stairs to the third floor less than ten minutes after she entered the building.  [Tr. at 187-88]  Before encountering Jones, she participated in securing the area.  [Tr. at 188]  As Agent Vehec arrived on the third floor, an agent instructed the employees to step away from their desks.  [Tr. at 188]  She did not recall whether the employees were told to put their hands on their heads or whether any employees put their hands on their heads.  [Tr. at 189]  She said that someone introduced her to Jones, but she did not recall who or where on the third floor that occurred.  [Tr. at 190]  At that point, they told Jones she was free to leave.  [Tr. at 191]  After being introduced to Jones in the hall, the agents and Jones went to an empty office near where they were introduced.  [Tr. at 190]  Agent Vehec said this office had a window and a door.  [Tr. at 190]  Agents Vehec and Lee sat beside each other on one side of the desk, and Jones sat on the other side of the desk.  [Tr. at 191]  She did not recall whether they closed the door.  [Tr. at 192]

On redirect examination, Agent Vehec stated that when she and Agent Lee told Jones that they had some questions for her, they also said that Jones's participation was voluntary.  [Tr. at 193]

Kevin Herman testified that on April 15, 2013, he worked for Pilot Flying J as a national account sales representative.  [Tr. at 197]  On that day, he was at Pilot headquarters in his

cubicle on the third floor when a man walked in and asked everyone to stand. [Tr. at 197, 199] Mr. Herman said, at first, he did not know if the man was joking, but when the man repeated his request more sternly and asked the employees to step away from their desks, he stood and stepped back from his desk. [Tr. at 199] After the man said this, a group of ten to fifteen law enforcement agents entered the floor behind him. [Tr. at 200-01] The agents were wearing blue jackets, and at least one jacket had "IRS" on the back. [Tr. at 200] Mr. Herman thought the agents may have been armed but could not recall "one-hundred percent." [Tr. at 200] The employees were told to put their hands on top of their heads and interlock their fingers. [Tr. at 200] Mr. Herman stated that he did not feel like he could move around or leave at this point. [Tr. at 205] He said that once the agents had their attention, their tone was not as stern. [Tr. at 200]

Mr. Herman stated that the agents moved to stand in front of the offices and around the cubicles. [Tr. at 201] Mr. Herman said that one of his coworkers had just finished eating some yogurt and threw the spoon away, which caused the agents to focus on her and ask what she had thrown away and why. [Tr. at 201-02] That employee had to retrieve her trash can and show the agents what she had thrown away. [Tr. at 202] Mr. Herman estimated that he stood with his hands interlaced on his head for fifteen to twenty minutes. [Tr. at 202]

Mr. Herman stated that approximately twenty-five minutes after the agents arrived, agents took him to a room to get his information. [Tr. at 202-03] At this point, he lowered his hands but he did not feel free to leave. [Tr. at 203, 205] He said that the agents told him to come with them, but they were not aggressive. [Tr. at 203] Once in the room, Mr. Herman sat down with the agent, who asked his name, title, and how long he had worked in that position. [Tr. at 203] Mr. Herman said the agent did not advise him of his rights or tell him that he did not have to

talk to the agent. [Tr. at 204] After the agent took Mr. Herman's information, the agent told Mr. Herman that he could get his belongings and leave. [Tr. at 204] Mr. Herman asked what he could take, and the agents showed him what he was allowed to take with him, which was his folder or his briefcase. [Tr. at 204] He was escorted to the stairs. [Tr. at 204] Mr. Herman stated that at no point, until the agents said he could get his belongings and leave, did he feel free to leave. [Tr. at 205]

On cross-examination, Mr. Herman testified that when the agent first arrived on his floor on April 15, 2013, he was not sure whether it was a joke. [Tr. at 207] He agreed that after the other agents arrived, he realized that it was not a joke and, instead, that the agents were executing a federal search warrant. [Tr. at 207] Mr. Herman agreed that the agents used a more assertive tone initially but that, after the employees understood this was not a joke, their tone softened. [Tr. at 208] He agreed that the agents did not know what his coworker had thrown into the trash can. [Tr. at 209] At the time the coworker threw the item away, the agents had already told the employees not to touch anything on their desks. [Tr. at 209] He agreed that when the agents told him he was free to leave, he understood that he could leave and he left. [Tr. at 209]

Barbara Yarber testified that on April 15, 2013, she worked as the administrative assistant for the direct sales division at Pilot Flying J. [Tr. at 211] On that day, she was in her cubicle on the top floor of the Pilot headquarters. [Tr. at 211-13] Ms. Yarber's cubicle was beside Heather Jones's cubicle. [Tr. at 213; Exh. 3, p.2] Ms. Yarber said two men entered the main door to their work area, and someone said, "This is a raid." [Tr. at 213] Ms. Yarber stated that she could not hear clearly because she was in the back of the room. [Tr. at 213] She said the agents used a forceful tone to tell the employees to stand, place their hands on their heads, and step away

from their computers and telephones.  [Tr. at 213-14]  The agents also told them not to talk.  [Tr. at 214]  Sixteen more agents gradually entered the floor.  [Tr. at 213-14]  The agents wore uniform jackets with IRS or FBI on them, and some wore bulletproof vests.  [Tr. at 213]  Ms. Yarber stated that the agents had weapons.  [Tr. at 213]

Ms. Yarber said that she complied with the agents' instructions.  [Tr. at 213]  She stated that as the employees stood with their hands on their heads, the agents walked the hallway between the offices and the cubicles.  [Tr. at 214]  Ms. Yarber said that one woman was on the telephone when the agents entered the room and did not realize what was happening.  [Tr. at 215]  The agents asked her to hang up the telephone several times, but she did not hear them.  [Tr. at 215]  When the agents walked to her cubicle, she quickly ended the call.  [Tr. at 215]  Ms. Yarber testified that once the employees were allowed to lower their hands, another employee threw a spoon away.  [Tr. at 215]  Ms. Yarber said that "several agents descended on her and pulled the spoon out of the garbage."  [Tr. at 215]  Ms. Yarber said she stood with her hands on her head for at least thirty minutes.  [Tr. at 215]  During this time, she was "pretty stressed out."  [Tr. at 215]  Ms. Yarber said that several employees needed to use the restroom, and agents escorted them to the restroom.  [Tr. at 216]  Once the employees were allowed to lower their hands, agents began approaching employees and speaking with them in the offices.  [Tr. at 216]  She said an agent walked up to her with a diagram of the cubicles on a clipboard, asked her identity, and told her she could go.  [Tr. at 216]  Ms. Yarber said that she did not feel free to leave or to move about during the encounter, until the agent told her she could go.  [Tr. at 217]

On cross-examination, Ms. Yarber testified that two agents entered the top floor initially, and then the other agents came gradually.  [Tr. at 218]  She said the eighteen agents stood

in the hallways and between the cubicles. [Tr. at 218] She agreed there are seven offices and seventeen cubicles in the area the agents were controlling. [Tr. at 218-19] She said that when she left the building, she saw numerous fire trucks blocking the two entrances to the Pilot parking lot. [Tr. at 221]

Heather Jones testified that on April 15, 2013, she worked for Pilot Flying J. [Tr. at 222] On that day, she was sitting at her desk in her cubicle in the direct sales area on the third floor of Pilot headquarters in Knoxville. [Tr. at 222-23] She stated that a man entered the work area, announced he was with the government and that it was a raid, and ordered the employees to stand up. Defendant Jones said that her cubicle was in the back, so she could not hear him very well. [Tr. at 223] The man also commanded them to step at least two feet away from their computers, to put their hands on their heads, and to be quiet. [Tr. at 224] Between fifteen and twenty more agents entered the work area after this man. [Tr. at 224] Jones said that she stood with her hands on her head for at least fifteen or twenty minutes. [Tr. at 224] She stated that she did not feel like she could leave or move about during this time. [Tr. at 227-28]

Defendant Jones stated that while she was standing with her hands on her head, a coworker threw an item in the trash, and the agents rushed to question that individual about what she did and why she had moved. [Tr. at 224] Defendant Jones said that if an employee needed to use the restroom, the agents escorted that person to the restroom. [Tr. at 225] She stated that a few minutes after the agents arrived, some coworkers were whispering and were "called out" by the agents for whispering. [Tr. at 225]

Defendant Jones testified that about twenty minutes after the agents arrived, some agents began looking for certain employees on a list. [Tr. at 225] Defendant Jones said that two

female agents came to her and said, "You need to come with us." [Tr. at 225] The agents escorted her to an office and closed the door. [Tr. at 226] Defendant Jones said that she sat in a chair with her back to the door and facing the window. [Tr. at 227] She said the agents sat beside each other facing the door. [Tr. at 227] Defendant Jones said the first thing the agents said to her was "Well, you know why we're here," and that they needed to ask her some questions. [Tr. at 227] Defendant Jones did not recall the agents telling her that she did not have to answer questions or that she was free to leave. [Tr. at 227] She said that the interview lasted thirty to forty-five minutes and that she did not feel like she could leave during the interview. [Tr. at 227-28] She stated that none of the agents advised her of her *Miranda* rights that day. [Tr. at 228] At the end of the interview, the agents escorted her to the door of the building. [Tr. at 228]

On cross-examination, Defendant Jones stated that the agents advised the employees in the cubicle area to sit still and not touch anything. [Tr. at 229] She guessed that one employee did not follow the agents' instructions when she threw an item away. [Tr. at 229] The agents then looked at what the employee threw away. [Tr. at 229] Defendant Jones said the agents were gruff and forceful, which caused her to be concerned. [Tr. at 230] She agreed that the employees in the direct sales division had access to a shared drive. [Tr. at 231] Defendant Jones stated that she did not recall Agents Lee and Vehec telling her that she did not have to answer questions when they approached her that day. [Tr. at 232] Defendant Jones admitted that after she entered the office, the agents told her that she did not have to talk to them but that they had some questions for her. [Tr. at 233] She agreed that it is possible that the agents told her that she was free to leave and that she did not recall it now. [Tr. at 236]

On redirect examination, Defendant Jones said that she remembered the agents telling her that she did not have to talk to them once they had moved from the cubicle area into an office. [Tr. at 237-38]

James Scott Wombold testified that on April 15, 2013, he was the Vice President of national accounts at Pilot Flying J. [Tr. at 241] His office was located on the top floor of the Pilot headquarters building. [Tr. at 241] He stated that on the afternoon of April 15, 2013, he was sitting at his desk, when he heard noise from outside of his office. [Tr. at 242] He stated that this was unusual, because the white noise system typically blocked the noise from the employees outside of his office. [Tr. at 242] Through his open door, he could see some of the inside sales representatives standing and placing their hands on their heads, and "a little bit of panic . . . ensuing." [Tr. at 242-43] Defendant Wombold stepped into the hallway and saw law enforcement officers in blue blazers with IRS or FBI on the back coming onto the floor. [Tr. at 243-45] He said the agents were yelling at the employees to stand up, step away from their desks, back away from their computers, put their hands up, and interlock their fingers on top of their heads. [Tr. at 243-44] He said the inside sales representatives stood in their cubicles with their hands clasped over their heads, and some were upset and crying or sobbing. [Tr. at 244]

Defendant Wombold said he stood outside of his office and watched what was occurring for two or three minutes. [Tr. at 245] FBI Special Agent Andy Fisher and another agent approached him, asked who he was, and identified themselves. [Tr. at 245-46] According to Wombold, the agents then demanded in a "very firm" tone that he step back into his office. [Tr. at 246] He complied, and the agents followed him into his office. [Tr. at 246] The agents asked him to sit down, and Wombold sat in the chair behind his desk. [Tr. at 247] One of the agents

partially closed the office door, leaving it open six or eight inches. [Tr. at 247] Defendant Wombold said for the next fifteen to twenty minutes, he looked through the partially open door from time to time, saw employees with their hands still intertwined on their heads, and heard a "muffled chaos." [Tr. at 247-48] He said, during this time frame, he did not see or hear anything that caused him to believe the agents were allowing the employees to leave. [Tr. at 264]

Defendant Wombold said the agents sat across from him in the chairs closest to the door. [Tr. at 248-50] He said the interview began cordially, with the agents stating that they wanted to ask him some questions. [Tr. at 250] He said the agents told him that they did not believe he had done anything wrong. [Tr. at 250] However, the agents said they believed that he knew the wrongdoer, and they asked him to cooperate. [Tr. at 250] Wombold said he told the agents that he wanted to cooperate. [Tr. at 251] Wombold testified that at the start of the interview, the agents said they could interview him in his office or offsite. [Tr. at 251] Wombold said the way they framed the question caused him to think the choice was to be interviewed at his office or at their office. [Tr. at 251-52] He denied that the agents ever clarified what they meant by "offsite." [Tr. at 252] He said he asked to be interviewed in his office, because he did not want to go to their office. [Tr. at 252] Wombold said he did not recall the agents offering to move to an alternative location later in the interview. [Tr. at 252] After this preliminary discussion, the agents asked Wombold if he knew Manny or Manuel. [Tr. at 250, 253]

Defendant Wombold said he remained seated in his chair behind his desk for the duration of the interview. [Tr. at 253] Located on his office wall beside the door was a white board with the names of most of Pilot's national accounts. [Tr. at 253, Exh. 18] Wombold said the agents questioned him about those accounts. [Tr. at 253] He said he did not recall the agents

leaving their seats to question him about items on the white board.  [Tr. at 254]  He said the cordial tone of the interview changed when the agents asked him which of the customers on the white board had he cheated.  [Tr. at 255]

Defendant Wombold stated that during the interview, he "felt like" the agents were armed.  [Tr. at 254]  He said he answered all of the agent's questions and that the agents did not doubt his answers, but they did take an accusatory tone.  [Tr. at 254, 256]  Wombold stated that the agents never advised him that he could decline to answer questions or to be interviewed.  [Tr. at 255]  He said the agents did not advise him that he was free to leave or that he was free to consult with counsel before talking to them.  [Tr. at 255]  Wombold testified that about thirty to forty-five minutes into the interview and the second time the agents asked him to point out a customer on the board, he said, "Guys, I think this is where I need to take a step back and see if I can get somebody from our legal department to guide me through these questions."  [Tr. at 256]  He said he indicated to the agents that he was talking about a lawyer who worked for Pilot.  [Tr. at 256]  Wombold stated that the agents replied that he watched too much television and that it did not work like that.  [Tr. at 257]  Wombold said he took this to mean that he did not know how the system worked and that he was going to answer their questions.  [Tr. at 257-58]  He said the agents did not stop questioning him or allow him to talk to an attorney.  [Tr. at 257]  Wombold said the agents told him that if he cooperated, it would bode well for him in the future but that if he did not cooperate, it would not bode well for him.  [Tr. at 258]  He said the tone of the interview became more aggressive as it progressed.  [Tr. at 259]

Defendant Wombold testified that during the interview, his cellular telephone was on his desk, and it rang several times.  [Tr. at 259]  One of the agents picked up Wombold's

cellular telephone, looked at it, and placed it on the desk near him.  [Tr. at 260]  Wombold said he felt like the agents were controlling his telephone because they had moved it closer to them and were asking questions about the people who called.  [Tr. at 260]  He said the agents allowed him to answer one call, when he begged to reassure his wife that he was okay.  [Tr. at 259]

Defendant Wombold stated that the third time the agents asked him to find a customer on the white board whom he had cheated, he leaned down to think.  [Tr. at 260]  The agent told him to back away from his desk, came around his desk, and looked under it.  [Tr. at 260]  Wombold said that he complied with the command to back away and that nothing was under his desk.  [Tr. at 261]  He said he felt like he had no choice except to comply with the agents' commands. [Tr. at 261]  Wombold said that the interview lasted two hours and that the agents did not offer him a break.  [Tr. at 261]  He stated that the interview ended when the agents stared at him for five minutes, then said, "Okay, you're done," and walked him out of the building.  [Tr. at 262]  Wombold said that he did not feel free to leave the interview or the building until he arrived at the door.  [Tr. at 262]  He said at the beginning of the interview, he did not feel like he was under arrest but that, by the end of the interview, he was wondering whether he would be allowed to leave or would be taken away.  [Tr. at 263]

On cross-examination, Defendant Wombold remained firm in his testimony that employees were sobbing during the raid on April 15, 2013, although none of the other witnesses had mentioned that.  [Tr. at 266-67]  He stated that his office door was open six to eight inches during the interview.  [Tr. at 268]  He said looking through that opening, he could see three or four employees with their hands up.  [Tr. at 268]  Wombold said he "had no problem meeting with" the agents and that he "told them [he] would voluntarily meet with them."  [Tr. at 269]  He said when

the agents entered his office and asked if he would talk to them, he said, "Yes," because "he wanted to do what he could to help." [Tr. at 269] Wombold agreed that he also wanted to learn more about what was going on with the federal investigation, after learning about the execution of a search warrant at Brian Moshier's house in Iowa. [Tr. at 269] He said that around 1:00 p.m., he received a call or a text from his wife about the Iowa search warrant. [Tr. at 270] As a result of the information he received from his wife, he called Brian Mosier's wife and learned the Mosier residence was being searched. [Tr. at 275-76] Wombold agreed that he then called Mark Hazelwood. [Tr. at 277] He testified that he assumed he and Hazelwood talked about the search of Mosier's residence, although he did not recall for sure. [Tr. at 277] Wombold agreed that he was curious about what was happening in Iowa, and when the federal agents executed the search warrant at Pilot headquarters, he "wanted to know how [he] was involved in it, why it involved me." [Tr. at 282]

Defendant Wombold stated that when the agents first entered his office, he and the agents made small talk. [Tr. at 280] At 1:54 p.m., Mark Hazelwood called Wombold's cellular telephone. [Tr. at 281] The agents looked at his phone and asked who is Hazelwood. [Tr. at 281] Wombold said he did not recall seeing any guns on April 15, 2013, but it was a "very aggressive raid[,]" which made him feel like weapons were involved. [Tr. at 282-83] Wombold said that he told the agents that he "wanted to go get somebody from our legal department to help guide me through the questions[.]" [Tr. at 284] He said he made this comment because the agents' questions were becoming "a little more accusatory." [Tr. at 284] He stated that he did not say that he wanted to get a lawyer. [Tr. at 284]

Defendant Wombold testified that although the interview was voluntary when it started, as the interview progressed, "there was nothing voluntary about it[,]" causing him to think that he might not get to leave. [Tr. at 284-85] He denied that halfway through the interview, the agents gave him the opportunity to move to another location. [Tr. at 285]

On redirect examination, Defendant Wombold said that he characterized the beginning of the raid as "panic ensuing" because it was noisy and eighteen to twenty agents were coming onto the floor. [Tr. at 286] He said he did not mistake the raid for a joke due to the stress and panic involved for the Pilot employees. [Tr. at 288] He said even after hearing about the search warrant for Mosier's house, he did not think agents would raid Pilot headquarters. [Tr. at 288] He said he did not know if the raid began at 1:48 p.m. [Tr. at 288-89] He said that immediately after a call from Mark Hazelwood registered on his cellular telephone, the agents asked him, "Who is Mark Hazelwood?" [Tr. at 289]

### III.    FINDINGS OF FACT

On April 15, 2013, federal agents executed a search warrant at the Iowa residence of Pilot employee Brian Mosier. The agents hoped that Mosier would agree to make recorded telephone calls to other Pilot employees. Instead, Mosier's wife called the wife of Pilot Vice President Scott Wombold in Knoxville, Tennessee; told her of the search; and asked Mrs. Wombold to have Mr. Wombold call her. Around 1:00 p.m. EST, Mrs. Wombold called her husband Scott Wombold, who returned the call to Mosier's wife and also called his boss Mark Hazelwood, President of Pilot Flying J.

At 1:48 p.m. that day, fifty-four law enforcement officers from several agencies executed a search warrant at the Knoxville, Tennessee headquarters of Pilot Flying J. Approximately twenty agents, who were wearing soft body armor under agency-identifying blue windbreakers, proceeded to the top floor, where the executive offices lined the perimeter of the building, surrounding an open area with rows of cubicles. The cubicle area is where the direct sales representatives worked. Although the agents were armed with service pistols, their weapons were not drawn. The first two agents to arrive on the top floor firmly instructed the direct sales representatives to stand, step away from their computers, and raise and interlock their hands over their heads. A white noise machine was in operation and some of the employees in the back could not hear the agents clearly. One employee, who was talking on her telephone, did not hear the agents at first and only ended her call when an agent walked up to her cubicle.

As more agents arrived on the floor, they fanned out in front of the offices and around the cubicles. Some agents were tasked with securing the offices. Agents then sought out Pilot employees whom the agents were previously assigned to attempt to interview. Special FBI Agent Andrew Fisher and Special IRS-CID Agent Robert Masterson located Scott Wombold standing in the hallway outside of his office and near the cubicle area. Agents Fisher and Masterson recognized Wombold from a photograph, approached him, confirmed that he was Scott Wombold, and identified themselves. Agent Fisher told Wombold that they would like to ask him some questions because they thought he had information that would aid their investigation. Wombold agreed to meet with the agents. The agents and Wombold waited briefly in the hallway, while other agents finished securing the offices.

Agents Fisher and Masterson walked with Wombold to his office and sat in two chairs, which were in front of Wombold's desk and near the door. The agents left the door to Wombold's office open six to eight inches. Wombold, who sat behind his desk and across from the agents, had an unobstructed path to the door. After a few minutes of cordial small talk, the agents told Wombold that the interview was voluntary, meaning that he was not required to talk to them. They said that Wombold was not under arrest and was free to leave. Wombold responded that he wanted to cooperate with them and "to do what he could to help." [Tr. at 269] The agents also told Wombold that they could interview him there in his office, or they could move to another location, such as a restaurant or his home, to talk. Wombold said that he preferred to remain in his office. Agents Fisher and Masterson were dressed in professional clothing, which covered their guns. The agents did not show their guns during the interview.

Wombold's cellular telephone, which was lying on his desk, rang five times during the interview. The agents asked Wombold to refrain from answering his cellphone and noted the identity of the callers with each call. The agents questioned Wombold about customers listed on a white board on his office wall. At one point during the interview, Agent Fisher told Wombold that he did not believe Wombold was being candid with him. Wombold leaned forward and lowered his hands below the desk. Agent Fisher told Wombold to show his hands. Agent Fisher then stood, walked around the desk, and looked under it to make sure that Wombold did not have a weapon. After determining that Wombold did not have a gun, Agent Fisher returned to his chair and continued the interview.

After one and one-half hours of questioning, Agent Fisher offered to move to another location of Wombold's choosing. Wombold declined this offer. Wombold's wife called

his cellphone at 3:11 p.m. and again at 3:45 p.m. Wombold asked the agents if he could take this second call from his wife to let her know that he was alright. The agents permitted him to answer this call. The interview lasted about two hours, ending at 4:03 p.m. Wombold did not ask for a lawyer or a break during the entire interview. Agents Fisher and Masterson walked with Wombold to the door of the building, and Wombold left.

While the interview of Defendant Wombold was taking place, other agents were working to identify the employees in the direct sales division cubicles. Within about ten to fifteen minutes of arriving on the top floor, the agents around the cubicle area allowed the employees to lower their hands and wait at or by their cubicles, although they were not allowed to touch their computers. At one point soon after the agents arrived, an employee threw away a plastic spoon, and the agents investigated what she had thrown away. Law enforcement had previously created a list of the Pilot employees whom they wanted to interview. Employees not on this list were allowed to leave, after they were identified. Kevin Herman, a national sales account representative, was allowed to gather his personal belongings and leave about thirty minutes after the agents first arrived. Barbara Yarber, an administrative assistant, was also allowed to leave approximately thirty minutes after the agents first arrived.

Special IRS-CID Agent Susanne Lee and Special FBI Agent Joelle Vehec (then Joelle Olszewski) were assigned to interview Heather Jones. Agents Lee and Vehec located Heather Jones approximately twenty minutes after the execution of the search warrant began. They approached Jones in the hallway by the cubicle area, introduced themselves, and told Jones that they would like to ask her some questions. Agent Lee told Jones that she did not have to talk to them and that if she chose not to talk to them, she would be free to go. Jones agreed to talk with

the agents and walked with them to an empty office.  Jones sat down behind the desk, and the agents sat in chairs across from Jones, who had her back to the office door.  The office had one window.  Agents Lee and Vehec were dressed in professional clothing and agency-identifying jackets.  They were armed, but their jackets covered their weapons.  The agents did not remove their guns during the interview, nor did they threaten to handcuff Jones.

At one point during the forty-five-minute interview, Agent Lee thought that Jones was not being truthful.  Agent Lee advised Jones of a federal statute prohibiting false statements to federal agents.  Jones did not request an attorney during the interview.  At the end of the interview, Agents Lee and Vehec accompanied Defendant Jones to the door of the building, and Jones left.


## IV.    ANALYSIS

Defendants Wombold and Jones argue that the statements they made during the search of Pilot headquarters on April 15, 2013, must be suppressed because the agents failed to advise them of the *Miranda* warnings in violation of the Fifth Amendment.  Both Defendants maintain that the agents subjected them to custodial interrogation because a reasonable person in those circumstances would not have felt free to leave.  The Government responds that the *Miranda* warnings were not necessary because neither Defendant Wombold, nor Defendant Jones, were in police custody.  Instead, the Government maintains that the Defendants both agreed to be interviewed by federal agents at their place of employment.  It contends that a reasonable person in the Defendants' circumstances would have felt that he or she could end the interview at will.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied* 523 U.S. 1122 (1998) (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

The obligation to administer *Miranda* warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of *Miranda*, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Salvo*, 133 F.3d at 948; *see also United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323; *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted)); *Swanson*, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the circumstances to ascertain a reasonable person's understanding of the situation. *Salvo*, 133 F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. *Swanson*, 341 F.3d at 529. "Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Swanson*, 341 F/3d at 529).[5] The Court examines the totality of the circumstances in the instant case with regard to each of the Defendants.

## A. Scott Wombold

Defendant Wombold argues that a reasonable person in his position on April 15, 2013, would not have felt free to decline the interview by Agents Fisher and Masterson. He argues that he was never told that he was free to leave or that he did not have to answer questions. Instead, Wombold contends that he was not free to leave but was taken to his office and questioned, while

---

[5] The Court of Appeals for the Sixth Circuit has previously enumerated the factors useful in determining whether an individual is in custody as:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950.

dozens of armed agents conducted a search just outside the partially open door. He contends that the agents restrained his freedom of movement, isolated him from other employees and his family, and "dominated him" during the interview. Defendant Wombold asserts that these circumstances reveal a restraint on his freedom that was the functional equivalent of an arrest.

Examining the circumstances surrounding Defendant Wombold's interview, the Court finds that Wombold was not in custody or the functional equivalent thereof. First and foremost, the Court examines whether a reasonable person in Wombold's position would have believed he was free to leave. Whether the officer tells the interviewee that he or she is free to decline to answer questions and to end the interview is "a particularly important factor showing that no custody occurred." *Panak*, 552 F.3d at 467; *Salvo*, 133 F.3d at 951 (concluding officer's statement that defendant was not under arrest was the "most significant[]" factor in assessing whether defendant was in police custody). In the instant case, the Court finds that the agents told Defendant Wombold that the interview was voluntary, that Wombold was not required to talk to them, that he was not under arrest, and that he was free to leave. This weighs heavily in favor of a finding that the interview was non-custodial.

The Defendant argues that upon encountering him in the hallway, the agents immediately demanded that he return to his small office, where they began questioning him. The Court finds that the testimony presented at the evidentiary hearing does not bear this argument out. Instead, the agents introduced themselves to Wombold, confirmed his identity, and told him that they would like to ask him some questions. After Wombold agreed to the interview, the agents then waited with him in the hallway, while all of the offices were checked for weapons and personnel. Wombold's office was one of the executive offices on the perimeter of the floor and

37

held a small table and chairs in addition to Wombold's wrap-around desk and credenza and two chairs in front of the desk. The agents sat in the chairs across the desk from Wombold. These chairs appear to be placed there for persons meeting with Wombold in his office. Although the agents were closer to the door than Wombold, they never blocked Wombold's path to the door. Once they were seated in his office, the agents exchanged small talk with Wombold before confirming that he understood the interview was voluntary. The undersigned rejects Defendant Wombold's contention that the agents demanded that he meet with them in his office, thereby restricting his freedom of movement.[6]

With regard to the first *Panak* factor, the location of the interview suggests that it was non-custodial. The agents questioned Defendant Wombold in his private office at his place of employment. The office contained two windows, and Wombold enjoyed an unblocked path to the door throughout the interview. Our appellate court has twice determined that a person interviewed at his or her place of employment was not in custody for purposes of *Miranda*. *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000) (observing defendant was interviewed in a large classroom with windows at the military camp where she worked), *superseded by statute on other gnds*; *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (concluding that an

---

[6] The Defendant also contends that by preventing him from receiving telephone calls, the agents limited his access to colleagues or family members who might have encouraged him to refuse to answer questions. The Court finds that the agents restricted Wombold's use of his cellphone during the interview by telling him that they would prefer he not answer calls and by monitoring who was calling him. However, Wombold's cellphone remained on his desk throughout the interview, and the agents allowed him to take a call from his wife near the end of the interview. The Court finds that the agents' restriction of Wombold's use of his cellular telephone did not prevent Wombold from ending the interview or leaving. For example, the agents did not seize Wombold's cellphone. As to the Defendant's argument that the restriction of his cellphone use contributed to the custodial feel of the interview, the Court notes that Wombold chose to be interviewed in his office, rather than meeting the agents at his home where presumably he would have had ample access to the support of his loved ones.

employee questioned at his place of employment was not in custody).[7]  Here, the agents gave Defendant Wombold the option to talk with them at another location, but he chose to remain in his office.  The Defendant's argument that the agents isolated him from his coworkers in order to intimidate him rings hollow when the Defendant chose to be interviewed in his office.  The Court finds that nothing about the location of the interview was inherently hostile or coercive.

Defendant Wombold argues the fact that a search warrant was being executed outside his office door during the interview and the fact that he had to be escorted from his office to the door of the building, show that he actually was not free to leave.  The fact that a search warrant was in progress does not itself render an interview to be custodial.  *See United States v. Roberts*, No. 3:08-CR-175, 2010 WL 234719, *2 (E. D. Tenn. Jan. 14, 2010).  However, "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the nature of the questioning all may transform . . . an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining."  *Panak*, 553 F.3d at 467.  Here, the surrounding circumstances did not create such a transformation.

Of the fifty-four law enforcement officers participating in the execution of the search warrant at Pilot headquarters, around twenty came to Wombold's floor.  Of those twenty, only Agents Fisher and Masterson went with Wombold to his office to conduct the interview.  Although Wombold's door remained partially open during the interview, Wombold did not claim

---

[7] Likewise, this Court has previously determined that individuals interviewed at work were not in custody for purposes of *Miranda*.  *See United States v. Downsbrough*, No. 3:13-CR-61, 2013 WL 5781570 (E.D. Tenn. Oct. 24, 2013) (Varlan, C.J.); *United States v. Roberts*, No. 3:08-CR-175, 2010 WL 234719 (E. D. Tenn. Jan. 14, 2010) (Phillips, J.).

to see other agents through the opening or that an agent was guarding his door.  The Court finds that the agents made a show of authority when they came on the floor, asking the employees to stand, raise their hands, and step back from their computers.  The agents then stationed themselves around the floor in order to monitor the actions of the employees.  However, the Court finds that the agents initial show of authority was short-lived, lasting for about fifteen minutes while the agents located all the employees, confirmed that no one was in a position to destroy evidence, and swept the floor for weapons.  The Court finds that the agents securing the cubicle area did not yell at the employees.  In fact, some of the employees in the back could not hear them.  After about fifteen minutes, the employees were allowed to lower their hands and sit down, although they were still required to remain away from their computers.  There is no evidence that Wombold was made to raise his hands while in the hallway.  Moreover, with the exception of asking him to show his hands when he reached under his desk, the record is devoid of any suggestion that Agents Fisher or Masterson restricted Wombold's movement, handcuffed Wombold, or blocked his path to the door during the entirety of the interview in Wombold's office.

None of the agents in the cubicle area on the top floor drew their weapons during the entire time that Wombold was in their presence.  Wombold's sense or feeling that the agents were armed notwithstanding, Agents Fisher's and Masterson's weapons were not visible during their interview of Wombold.  Accordingly, the Court finds that nothing about the ongoing execution of the search warrant transformed the familiar office location into an environment that a reasonable person would deem to be hostile.  *See Panak*, 553 F.3d at 467.

The second *Panak* factor looks at the length and nature of the questioning. Wombold's interview lasted two hours.  Although the agents did not take a break during the

interview, the first ten to fifteen minutes of the interview was spent making small talk, and the agents permitted Wombold to take a telephone call from his wife near the end of the interview. A two-hour interview is not inherently custodial. *See Panak*, 552 F.3d at 467 (observing that an interview of one and one-half hours can be non-custodial); *United States v. Banks*, No. 09-34-ART, 2010 WL 1451357, *4 (E.D. Ky Apr. 9, 2010) (determining that an interview of two to three hours was non-custodial).

With regard to the tone and manner of questioning, Agents Fisher and Masterson approached Wombold, introduced themselves to him, and said they would like to ask him some questions. Wombold characterized their conversation in his office as cordial at the beginning but becoming more assertive and accusatory as the interview progressed. At one point, the agents accused Wombold of not being candid with them. Also, Agent Fisher directed the Defendant to show his hands, and then Agent Fisher stood and checked behind Wombold's desk, when he thought Wombold was reaching under his desk for a weapon. Agent Fisher did not restrain the Defendant and returned to his chair, once he confirmed that Wombold did not have a weapon. In order for an agent's tone and manner of questioning a defendant to cause the interview to be custodial, the tone and manner of the interrogation "must somehow relate to the suspect's freedom of action." *Salvo*, 133 F.3d at 952; *Banks*, 2010 WL 1451357, at *4. In the instant case, the record is devoid of evidence that the agents said anything to Wombold that indicated that he could not leave.[8] In fact, the Court finds that the agents offered to move to another location of Wombold's

---

[8] The Defendant argues that by denying his request to talk to an attorney, the officers demonstrated their complete control over him. The Court credits the testimony of both Agent Fisher and Agent Masterson that Wombold never asked for an attorney during the interview. Although the Defendant's testimony varied, he also stated that he did not ask for a lawyer. Even if this factor had some bearing upon the custodial nature of an interview, the Court finds it inapplicable in this case.

choosing both at the start of the interview and again three quarters of the way through the interview. Neither the length, nor the tone of the interview would have caused a reasonable person to believe that he or she could not leave.

The Court has already considered the third *Panak* factor at length above. With the exception of a few minutes when Wombold had to show his hands when the agent thought he was reaching for a gun, Wombold enjoyed unrestrained freedom of movement during the interview. Wombold was never handcuffed. The agents did not forbid Wombold from leaving his office. His office door was left partially open during the interview, and Wombold's path to the door remained unobstructed. The fact that Wombold was not free to roam the building during the execution of a search warrant does not equate to a lack of freedom to leave. The Court finds that a reasonable person in these circumstances would have believed they were free to leave.

Finally, the Court considers the fourth *Panak* factor, whether the agents told Wombold that he did not have to answer questions. Agent Fisher testified that he told Wombold that the interview was completely voluntary and that he did not have to talk to them. Agent Fisher memorialized the interview in a report in which he stated that the agents advised Wombold that his participation in the interview was voluntary. [Exh. 10, p.1] Although the Court does not consider Wombold's subjective beliefs when analyzing whether the interview was custodial, the Court finds that Wombold's testimony about those beliefs supports the truth of Agent Fisher's account. Defendant Wombold testified that he considered the interview to be voluntary and that he wanted to talk to the agents. This testimony confirms Agent Fisher's testimony that he told Wombold that his participation in the interview was voluntary. The Court finds this factor weighs

heavily in favor of a finding that a reasonable person in Defendant Wombold's position would have been able to decline answering questions.

After considering the totality of the circumstances, the undersigned finds that a reasonable person in the Defendant's situation would have believed he or she was free to leave. Defendant Wombold was not in custody during his April 15, 2013 interview by Agents Fisher and Masterson and, thus, the *Miranda* warnings were not required. The Court recommends that Wombold's motion to suppress his statements [Doc. 132] be denied.

## B.   Heather Jones

Defendant Jones also argues that she was in custody during her April 15, 2013 interview at Pilot headquarters. She contends that she was not told that she was free to leave and that any comments by the agents indicating that she did not have to answer questions were illusory in light of the circumstances preventing her from leaving. Moreover, she maintains that the location, the accusatory tone of the agents during the forty-five minute interview, and the restrictions on her freedom of movement would cause a reasonable person to believe she was in custody. The Court disagrees with both Defendant Jones's framing of the facts and the conclusions she draws from them.

First, the Court finds that when Agents Lee and Vehec approached Defendant Jones in the vicinity of the cubicles, they introduced themselves and told Jones they would like to ask her some questions. Agent Lee told Jones that she did not have to talk to them and that, if she chose not to talk to them, she would be free to go. Thus, the Court finds that the agents told

Defendant Jones that she was free to leave before the interview began. This exchange is documented in Agent Lee's Memorandum of Interview [Exh. 4, ¶1], which Agent Lee created on the day following the interview and which states "It was explained to Ms. Jones that her participation in an interview was voluntary, and she could cho[o]se to leave at any time." On cross-examination, Defendant Jones admitted that the agents told her that she did not have to talk to them and that they could have told her that she was free to leave. The Court finds that the strongest factor supporting a finding that the interview was not custodial is that Defendant Jones was expressly told that she did not have to talk to the agents and that she could leave. However, Defendant Jones argues that this information from Agent Lee was illusory, because the circumstances surrounding her interview reveal that she was actually not free to leave. The Court turns to these circumstances.

With regard to the location of the interview, the Court finds that, as with Defendant Wombold, Defendant Jones was interviewed at her place of employment. As discussed above, one's place of employment, like one's home, is generally not a hostile or coercive environment. *See Crossley*, 224 F.3d at 862; *Mahan*, 190 F.3d at 422. However, Defendant Jones argues that the circumstances of the instant search warrant execution altered the feeling of familiarity typically associated with an interview at one's job. Defendant Jones contends that numerous federal agents "stormed" the third floor of Pilot headquarters, yelling at the employees to step away from their computers, raise and interlock their hands atop their heads, and remain silent. She contends that agents surrounded the employees, shouting at them for moving or speaking and requiring her to stand with her hands clasped over her head for one-half hour. She maintains that immediately on the heels of this extreme situation, Agents Lee and Vehec marched her to an office and interrogated

her behind a closed door. She argues that a reasonable person would not have felt free to decline the interview and leave under these circumstances.

Here, again, the Court parts ways with Defendant Jones's characterization of the facts. The testimony at the evidentiary hearing revealed that one or two agents were first on the floor, firmly yet calmly directing the employees in the cubicle area to stand, step away from their computers, and raise their hands. The allegations of yelling and shouting are not borne out by the testimony; and, in fact, the agents were too soft spoken to be heard by all of the employees over the white noise machine. While agents did surround the cubicle area, they permitted the employees to lower their hands within fifteen minutes of their arrival on the floor. Then, the agents permitted the employees to sit or stand near their cubicles while they identified the employees and either requested an interview or allowed them to collect their personal belongings and escorted them out of the building. Although Defendant Jones and Ms. Yaber testified that agents were escorting employees to the restroom, Defendant Jones did not testify that she had to be so escorted. The Court finds that although Defendant Jones was briefly detained for fifteen minutes while the agents secured the area, the actions occurring approximately five minutes before Agents Lee and Vehec approached her did not convert the interview into a custodial interview.

Defendant Jones likens the circumstances surrounding her interview to that in *United States v. Mahar*, a case in which our appellate court found an interview that occurred during the execution of a search warrant at a business was custodial. 801 F.2d 1477, 1500 (6th Cir. 1986). In *Mahar*, twenty law enforcement officers pushed their way into a pharmacy and ordered the defendant pharmacist at gunpoint to raise his hands against the wall in a separate room, where he remained for twenty minutes and, at one point, was hit on the head by an officer when defendant

spoke to another employee. *Id.* at 1500-1501. The pharmacist was then photographed and taken to other parts of the pharmacy and clinic, while the officers collected evidence. *Id.* Finally, he was escorted to an examination room, where an agent took his statement without providing the *Miranda* warnings or telling him he was free to go, while other agents stood outside the open door. *Id.* at 1501. The court held that a reasonable person would not have felt free to leave in these circumstances because the defendant pharmacist was detained by armed officers in two locations in the building prior to the interview and was never advised that he could leave. *Id.*

While *Mahar* and the instant case share some important facts—the large number of agents present, the fact that the interview occurred in connection with the execution of a search warrant at a business, the detention prior to the interview, and the raised hands—they differ in several crucial ways: (1) The agents did not force an entry into Pilot or onto the third floor; (2) Defendant Jones was not detained at gunpoint; (3) Defendant Jones was never struck by agents; (4) Defendant Jones was not photographed; (5) Defendant Jones was not detained at more than one location in Pilot while the agents gathered evidence; (6) Defendant Jones was told that she did not have to participate in the interview and that if she chose not to participate, she could leave; and (7) agents did not guard the door to the office during Jones's interview. All of these differences would contribute to a reasonable person in the circumstances that occurred in *Mahar* believing he or she was likely being arrested and was not free to leave. On the other hand, the absence of these different circumstances and the presence of an unequivocal and direct statement that she was free to leave would cause a reasonable person to draw a different conclusion in this case.

Additionally, the Court finds that the office in which Defendant Jones was interviewed did not contribute to a sense that the interview was custodial. The Court finds that

46

Defendant Jones sat across the desk from the agents. Jones, who was facing the window, had her back to the door and, thus, had an unblocked path to the door during the interview. There was no testimony that the office was unusually small or confining.

The Court also finds that the length and manner of questioning were not such that a reasonable person would have felt he or she was in custody. Defendant Jones was questioned for forty-five minutes, a length that "compares favorably with other encounters [our appellate court] ha[s] deemed non-custodial." *Panak*, 552 F.3d at 467 (upholding an unwarned interview of forty-five minutes to one hour); *Crossley*, 224 F.3d at 862 (affirming an unwarned interview which lasted under one hour); *Mahan*, 190 F.3d at 422 (affirming an unwarned interview of one and one-half hours).

Moreover, the Court finds that the tone of the interview was professional. The accusatory comments that the Defendant sets out in her brief were not proven at the hearing. Agent Lee stated that at one point, when she felt that the Defendant was not being truthful, she advised the Defendant of a federal statute making it a felony to lie to a federal agent. Although Agent Lee informed Defendant Jones of the consequences of lying, this did not render the interview custodial. *See Crossley*, 224 F.3d at 862 (finding that "[a]lthough [the agent] told [the defendant] that she could be arrested if she lied, a reasonable person would understand that this statement applies to anyone who lies to federal agents and was not specifically directed to her particular situation in that interview"); *Mahan*, 190 F.3d at 422–23 (determining that although the agent told the defendant "that giving false information during the interview would be a serious matter[,]" that factor did not "even remotely constitute[ ] a restraint on the freedom of movement to the degree associated with formal arrest"); *see also Roberts*, 2010 WL 234719, at *24

47

(concluding that the tenor of the interview was not intimidating despite agent's confronting defendant with lying and informing him that such constituted a felony). The Court notes that Defendant Jones did not mention this advice regarding the statute in her testimony at the evidentiary hearing.

The Court finds that, while Defendant Jones's movements were restricted when the agents initially entered the building, at the time of the interview, she was not restrained. First, Defendant Jones and the employees in the cubicle area were not handcuffed, nor did agents ever point weapons at them. Although none of the Pilot employees were allowed to move about the building during the execution of the search warrant, the fact that an individual is briefly detained during or immediately prior to questioning does not alone render the questioning custodial. *See Swanson*, 341 F.3d at 529-31 (concluding defendant was not in custody when detained outside of a tattoo parlor). *C.f., United States v. Blum*, 614 F.2d 537, 540 (6th Cir. 1980) (requiring *Miranda* warnings when defendant was separated from his companions and questioned in a police cruiser during an unwarranted extension of a *Terry* stop). Here, while Defendant Jones did not initiate contact with the agents, she was expressly told that she did not have to answer questions and that she was free to leave. The Court finds that a reasonable person in the circumstances experienced by Defendant Jones would have felt that he or she could decline the interview and leave.

In summary, the Court finds the agents' admonition that Defendant Jones did not have to talk to them and could leave was not illusory. This statement of the agents along with the surrounding circumstances reveal that the interview of Defendant Jones was not custodial. Accordingly, the *Miranda* warnings were not required, and the undersigned recommends that Defendant Jones's motion also be denied.

## V.    CONCLUSION

The Court finds that Defendants Wombold and Jones were not in custody at the time they gave statements during the execution of a search warrant at Pilot headquarters on April 15, 2013.  As a result, the *Miranda* warnings were not required.  Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant Scott Wombold's Motion to Suppress Statements [**Doc. 132**] and the Motion to Suppress Oral Statements Made by Defendant Heather Jones [**Doc. 134**] be denied.[9]

Respectfully submitted,

_____
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).