UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | |
| SCOTT WOMBOLD, | ) | Judge Collier |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

On February 8, 2017, Defendant Scott Wombold filed a motion to suppress oral statements he allegedly made to law enforcement agents on April 15, 2013. (Docs. 132, 133.) Defendant argued these alleged statements were made in violation of his rights under the Fifth Amendment because he made them in response to interrogation by law enforcement officers while he was in their custody, and they did not first give the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The Government responded in opposition, arguing Defendant was not in custody at the time of the relevant interview and *Miranda* warnings were therefore not required. (Docs. 144, 165.) Defendant replied (Doc. 151).

Magistrate Judge Bruce Guyton held an evidentiary hearing on the motion on March 24, 2017 and issued a report and recommendation (the "R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) on June 1, 2017 recommending the motion to suppress be denied. (Doc. 180.) The Magistrate Judge agreed with the Government that Defendant was not in custody when he gave his statements and *Miranda* warnings were therefore not required. (*Id.*) Defendant objected to the R&R on June 15, 2017. (Doc. 186.) He identifies five specific instances in which the Magistrate Judge did not credit his testimony; objects to the weight the Magistrate Judge gave to three other

specific circumstances in determining whether he was in custody; and objects to the Magistrate Judge's analysis of whether he was in custody under all of the circumstances, even if his other specific objections are overruled. The Government responded in opposition on June 28, 2017. (Doc. 195.)

The Court has reviewed the transcript of the hearing, the exhibits introduced at the hearing, and the briefs of the parties filed before and after the R&R issued. The Court will **MODIFY** certain factual findings in the R&R (Doc. 180) and **ACCEPT** and **ADOPT** the remainder of the R&R.[1] Defendant's motion to suppress (Doc. 132) will be **DENIED**.

## I.    BACKGROUND

The R&R begins with a detailed summary of the testimony provided by each of the ten witnesses at the suppression hearing. (Doc. 180 [R&R] § II, at 3–30.) Defendant does not object to this portion of the R&R. (Doc. 186 [Def.'s Obj.] at 21 ("The R&R does many things right. It takes great pains to recount the testimony at the hearing accurately and thoroughly.")) The Court accordingly incorporates Section II of the R&R by reference. The R&R next sets out specific findings of fact relevant to Defendant's motion. (Doc. 180 [R&R] at 30–33.) Defendant largely accepts these findings of fact, objecting only to the Magistrate Judge's failure to credit Defendant's testimony on five specific factual issues. (Doc. 186 [Def.'s Obj.] at 7.) The following recitation of the factual background is therefore derived primarily from the R&R, and it identifies the factual issues as to which Defendant makes specific objections.

---

[1] The R&R also recommends denial of a motion to suppress filed by codefendant Heather Jones (Doc. 132). The Court accepted that portion of the R&R and denied Jones's motion to suppress by separate order (Doc. 199).

On April 15, 2013, federal agents executed two search warrants in connection with an investigation into possible fraudulent billing practices by employees of Pilot Travel Centers LLC ("Pilot"). Agents executed the first search warrant at the residence of Pilot employee Brian Mosher[2] in Iowa. Mr. Mosher's wife then called Defendant's wife in Knoxville, Tennessee, told her about the search, and asked her to have Defendant—then Pilot's Vice President of National Accounts—return her call. Mrs. Wombold called Defendant at approximately 1:00 p.m. Eastern time. After speaking with his wife, Defendant placed calls to Mrs. Mosher and his supervisor, Pilot's then-President Mark Hazelwood.[3]

Beginning at 1:48 p.m., fifty-four law enforcement officers from the Federal Bureau of Investigation (the "FBI") and the Internal Revenue Service Criminal Investigation Division (the "IRS-CID") entered Pilot headquarters in Knoxville to execute the second search warrant. Approximately twenty of these officers went directly to the third floor. The third-floor layout consisted of executive offices around the outside of the floor, including Defendant's office, with cubicles for direct sales representatives in an open area in the middle.

The agents who went to the third floor were dressed in suits (Doc. 177 [Fisher Tr.] at 37–38), over which they wore soft body armor topped by blue wind-breakers bearing the initials of their respective agencies. The agents wore service pistols but did not unholster them.

The R&R found the following facts regarding the beginning of the search of the third floor:

> The first two agents to arrive on the top floor **_firmly instructed_** the direct sales representatives **_to stand, step away from their computers, and raise and interlock their hands over their heads_**. A white noise machine was in operation and some

---

[2] Spelled "Mosier" in the R&R.

[3] Mr. Hazelwood is also a defendant in this case.

of the employees in the back could not hear the agents clearly. One employee, who was talking on her telephone, did not hear the agents at first and only ended her call when an agent walked up to her cubicle.

As more agents arrived on the floor, they fanned out in front of the offices and around the cubicles. Some agents were tasked with securing the offices. Agents then sought out Pilot employees whom the agents were previously assigned to attempt to interview. Special FBI Agent Andrew Fisher and Special IRS-CID Agent Robert Masterson located Scott Wombold standing in the hallway outside of his office and near the cubicle area. Agents Fisher and Masterson recognized Wombold from a photograph, approached him, confirmed that he was Scott Wombold, and identified themselves. ***Agent Fisher told Wombold that they would like to ask him some questions because they thought he had information that would aid their investigation. Wombold agreed to meet with the agents.*** The agents and Wombold waited briefly in the hallway, while other agents finished securing the offices.

(Doc. 180 [R&R] at 31 (emphasis added).) Defendant makes one factual objection to each of the foregoing paragraphs of findings: he objects to the R&R's rejection of his testimony that the agents *yelled at* the Pilot employees when they arrived on the third floor, and to its rejection of his testimony that Agent Fisher and Agent Masterson *demanded* he return to his office to be interviewed. (Doc. 186 [Def.'s Obj.] at 7.) Defendant also objects that the R&R understates the significance for the custody analysis of the agents' forcing Pilot employees to hold their hands in the air for at least fifteen minutes at the beginning of the search. (*Id.* at 15–18.)

The R&R found the following facts regarding the beginning of Defendant's interview:

Agents Fisher and Masterson walked with Wombold to his office and sat in two chairs, which were in front of Wombold's desk and near the door. ***The agents left the door to Wombold's office open six to eight inches.*** Wombold, who sat behind his desk and across from the agents, had an unobstructed path to the door. After a few minutes of cordial small talk, ***the agents told Wombold that the interview was voluntary, meaning that he was not required to talk to them. They said that Wombold was not under arrest and was free to leave.*** Wombold responded that he wanted to cooperate with them and "to do what he could to help." [Tr. at 269] The agents also told Wombold that they could interview him there in his office, or they could move to another location, such as a restaurant or his home, to talk. Wombold said that he preferred to remain in his office. Agents

Fisher and Masterson were dressed in professional clothing, which covered their guns.[4] The agents did not show their guns during the interview.

(Doc. 180 [R&R] at 32 (emphasis and footnote added).) Defendant objects to the R&R's rejection of his contrary testimony, that the agents *did not* tell him he was free to leave and ***did not*** tell him he could decline to speak with them. (Doc. 186 [Def.'s Obj.] at 7.) Defendant also objects to the R&R's alleged erroneous conclusion, detailed elsewhere, that he could not see agents other than the two interviewing him through the opening of his office door during his interview. (*Id.* at 18–19.)

The R&R continues its description of the interview as follows:

> Wombold's cellular telephone, which was lying on his desk, rang five times during the interview. The agents asked Wombold to refrain from answering his cellphone and noted the identity of the callers with each call. The agents questioned Wombold about customers listed on a white board on his office wall. At one point during the interview, Agent Fisher told Wombold that he did not believe Wombold was being candid with him. ***Wombold leaned forward and lowered his hands below the desk. Agent Fisher told Wombold to show his hands. Agent Fisher then stood, walked around the desk, and looked under it to make sure that Wombold did not have a weapon.*** After determining that Wombold did not have a gun, Agent Fisher returned to his chair and continued the interview.

> After one and one-half hours of questioning, Agent Fisher offered to move to another location of Wombold's choosing. Wombold declined this offer. Wombold's wife called his cellphone at 3:11 p.m. and again at 3:45 p.m. Wombold asked the agents if he could take this second call from his wife to let her know that he was alright. The agents permitted him to answer this call. The interview lasted about two hours, ending at 4:03 p.m. ***Wombold did not ask for a lawyer*** or a break during the entire interview. Agents Fisher and Masterson walked with Wombold to the door of the building, and Wombold left.

(Doc. 180 [R&R] at 32–33 (emphasis added).) Defendant objects to the R&R's rejection of his testimony that he asked for an attorney during the interview. (Doc. 186 [Def.'s Obj.] at 7.) He also objects that the R&R's custody analysis discounts the importance of the agents' control over

_____

[4] Fisher testified he had removed his windbreaker and soft body armor by this point. (Doc. 177 [Fisher Tr.] at 64.)

him as demonstrated by Agent Fisher's reaction when Defendant put his hands under his desk. (*Id.* at 15–18.)

## II.    STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R or the specified proposed findings or recommendations to which objection is made.  28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the Magistrate Judge.  *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980).  The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. *See Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999).  The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference.  *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

In resolving objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P.  72(b)(3).

## III.    ANALYSIS

A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self-incrimination.  *See Miranda*, 384 U.S. at 467–68 (1966).   In determining whether a person is "in custody" for purposes of *Miranda*, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)) (alteration in original). Thus, it is possible for a person to be detained, such as during an ordinary traffic stop, but not in custody for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 436–41 (1984).

To determine whether Defendant's freedom was restrained to the degree associated with a formal arrest such that he was in custody during the interview, this Court considers the following non-exhaustive list of factors: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010); *see also United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (listing factors). Other factors may include whether the individual "was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so." *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). The Court conducts its analysis "from the perspective of a reasonable person '*innocent of any crime*.'" *Panak*, 552 F.3d 462 at 469 (quoting *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003)).

Defendant makes three categories of objections to the R&R: (1) he objects to five specific facts as to which the Magistrate Judge did not credit his testimony; (2) he objects to the weight the Magistrate Judge gave to three circumstances in considering whether he was in custody; and (3) he objects to the Magistrate Judge's recommendation generally even if his other specific objections are overruled. The Court will consider each of these categories of objections in turn.

### A. Whether the Magistrate Judge Should Have Credited Defendant's Testimony in Five Specific Instances

Defendant identifies five specific facts as to which he argues the Magistrate Judge erred in not crediting his testimony: that the agents yelled at employees on the third floor; that Agent Fisher and Agent Masterson demanded he return to his office for an interview; that the agents did not tell him he was free to leave and could decline to speak with them[5]; and that he asked for an attorney during the interview.

### 1. Whether Agents Yelled at Pilot Employees

Defendant argues the Magistrate Judge erred in not crediting his testimony that the agents yelled at employees on the third floor at the beginning of the search.

Defendant testified that on the afternoon of April 15, 2013, he heard noise and rumbling outside his open office door. He hesitated a moment, then got up and saw some of the sales representatives standing up, putting their hands on their heads, "and a little bit of panic . . . ensuing." (Doc. 177 [Wombold Tr.] at 242–43.) He stepped out of his office and saw what he believed to be several law enforcement officers, wearing blue blazers marked FBI and IRS, "kind of storming the office, so to speak." (*Id.* at 243, 245.) As to the officers' conduct, he testified "They were basically coming down the hallway, and they were yelling at people to back away from their desks and put their hands up and interlock their fingers on top of their head." (*Id.* at 243.) Defendant testified he stood there in the hall for a few minutes, "[j]ust kind of watching what was going on and trying to figure out what was happening." (*Id.* at 245.) He described the scene as "a little bit of a chaotic situation . . . you had people yelling, and you had the girls— some of the girls were crying and upset and visibly shaken, and I just stood there for a couple

_____

[5] Defendant lists this as two separate objections. The Court addresses them together because of their similarity.

minutes, and then I had somebody approach me." (*Id.* at 244.) Although Defendant was standing in the hallway of the cubicle area, he did not testify that he was yelled at, or ordered to raise his hands, or did raise his hands. (*See* Doc. 180 [R&R] at 40.)

Defendant argues the Magistrate Judge's finding that the agents spoke firmly, but did not yell, is erroneously based on one witness's speculation about the reason a certain employee did not hang up her phone until an agent walked up to her desk, as well as on testimony that employees at the back of the room could not hear everything that was happening at first. Defendant is correct that certain people not being able to hear everything that happened does not mean there was never any yelling. However, none of the other witnesses—including one codefendant and two non-party Pilot employees who were in the cubicle area during the search— testified that the agents were yelling or shouting.[6] And one of the agents testified affirmatively that there was no yelling: "I would say it was done in more like a [sic] authoritative voice, but it was not hollering and screaming. It was fatherly."[7] (Doc. 177 [Bukowski Tr.] at 127.)

The Court finds Defendant's argument unconvincing. The Magistrate Judge had the opportunity to observe and hear the witnesses and assess their demeanor and thus was in the best position to determine credibility. *See Moss*, 286 F.3d at 868. Defendant's own testimony, including his use of dramatic characterizations (such as "storming the office," "crying and sobbing," and "chaotic situation") combined with strong qualifiers (such as "kind of . . . so to

---

[6] The testimony of codefendant Jones, who was in the cubicle area, makes it clear she heard no yelling: she testified she saw two men walk through the main door, "[a]nd someone *said*, 'This is a raid.' I was in the back of the room, so I couldn't hear everything that was going on up front. Be we were *told* to stand up, put our hands on our heads, and step away from our computers and our phones." (Doc. 177 [Jones Tr.] at 213 (emphasis added).) She described the agents' tone as *forceful*. (*Id.* at 214.)

[7] The Court rejects Defendant's argument that testimony about "hollering or screaming" is not testimony about "yelling" in this context. (*See* Doc. 186 [Def.'s Obj.] at 12–13 n.11.)

speak" and "a little bit of a . . ."), give the Court additional reason to pause in considering his credibility on this issue. In the end, the Magistrate Judge's assessment of the witnesses' testimony is entitled to deference, *Irorere*, 69 F. App'x at 236, and Defendant has not presented sufficient evidence to call this assessment into question.

### 2.    Whether Agents Demanded Defendant Return to his Office

Defendant argues the Magistrate Judge erred in not crediting his testimony that Agent Fisher and Agent Masterson demanded he return to his office for an interview. He argues he was the only witness to testify specifically as to whether or not such a demand occurred, so the Magistrate Judge had no grounds to reject his testimony about a demand even if the Magistrate Judge generally found the agents more credible than he on points as to which they all testified.

As the Government points out, the R&R specifically addresses and rejects Defendant's testimony that there was a demand, describing the other testimony the Magistrate Judge found more credible:

> The Defendant argues that upon encountering him in the hallway, the agents immediately demanded that he return to his small office, where they began questioning him. The Court finds that the testimony presented at the evidentiary hearing does not bear this argument out. Instead, the agents introduced themselves to Wombold, confirmed his identity, and told him that they would like to ask him some questions. After Wombold agreed to the interview, the agents then waited with him in the hallway, while all of the offices were checked for weapons and personnel. . . . Once they were seated in his office, the agents exchanged small talk with Wombold before confirming that he understood the interview was voluntary. The undersigned rejects Defendant Wombold's contention that the agents demanded that he meet with them in his office, thereby restricting his freedom of movement.

(Doc. 180 [R&R] at 37–38.)

The Court also notes Defendant's own characterizations of this initial interaction. Defendant's first detailed description of the interaction was "They asked who I was again, and they identified themselves, and they asked me to step back into my office." (Doc. 177

[Wombold Tr.] at 246.)  When asked how the agents asked him to step back into his office, Defendant said "They said, 'Step back into your office, please,' very firm."  (*Id.*)  In answer to his attorney's question about whether this was a request or a demand, he said it was "absolutely a demand."  (*Id.*)  On cross examination, Defendant testified further as follows:

> Q    Okay.  Is it your testimony today that you did not want to meet with these agents?
>
> A    No.
>
> Q    You did not want to meet with them?
>
> A    No.  I had no problem meeting with them.  I told them I would voluntarily meet with them.
>
> Q    Oh, you did?
>
> A    Yes.  When they came in and they said, "Will you talk to us," I said, "Yes."
>
> Q    Because you actually did want to talk to them, didn't you?
>
> A    I wanted to do what I could to help.

(*Id.* at 269.)  Defendant also testified on cross examination that "when the interview started, it was totally voluntary.  By the end of it, it was nothing—there was nothing voluntary about it." (*Id.* at 284–85.)  Thus, except for one characterization as a "demand" in response to a direct question by his attorney, Defendant's own testimony indicates the interaction between himself and the agents began with firm but polite requests on the agents' part and a willingness to talk on Defendant's part.[8]

In addition to the words used, it is clear the Magistrate Judge considered the amount of time that passed between Defendant's initial exchange with the agents and when they went into

---

[8] Some of Defendant's testimony is ambiguous as to the distinction between interactions in the hallway and initial interactions in his office.  Nevertheless, Defendant's testimony taken as a whole gives minimal support to the proposition that the agents made a demand.

his office. Defendant testified there was only about a minute between the beginning of the exchange and when they went into the office, so that he still could see "[a] lot of people moving around, agents with employees going back and forth and people still with their hands intertwined on their head" for the first fifteen or twenty minutes of the interview. (*Id.* at 247.) The testimony of all of the other witnesses and about the way the search was designed tended to support the Magistrate Judge's conclusion that a longer period of time elapsed, long enough for other agents to do protective sweeps of the area and all of the offices, including Defendant's. The Court agrees with the Magistrate Judge that the agents and Defendant waited to go back into Defendant's office while the other agents finished their sweeps of the offices. Such a timeline is unlikely to be compatible with a "demand" that Defendant go back into his office.

Given all of the testimony and the deference due to the Magistrate Judge's assessment of the witnesses' credibility, the Court accepts the Magistrate Judge's finding that the agents asked, but did not "demand," that Defendant return to his office for an interview.

### 3. Whether Agents Told Defendant He Could Leave or Decline to Speak with Them

Defendant argues the Magistrate Judge erred in not crediting his testimony that Agent Fisher and Agent Masterson did not tell him he was free to leave and could decline to speak with them.[9] He does not provide specific grounds for these two objections in his brief, except to state that the Magistrate Judge rejected his testimony on these two facts exclusively because the Magistrate Judge credited the agents' contrary testimony. (*See* Doc. 186 [Def.'s Obj.] at 7, 10.) As Defendant correctly acknowledges, finding other testimony more credible is a permissible basis for rejecting conflicting testimony. (*See id.* at 14.) Defendant has not presented any

_____

[9] Defendant does not object to the finding that the agents told him he was not under arrest.

grounds to overcome the deference owed to the Magistrate Judge's assessment of the witnesses' testimony on these two facts. *See Irorere*, 69 F. App'x at 236.

### 4. Whether Defendant Asked for an Attorney

Defendant argues the Magistrate Judge erred in not crediting his testimony that he asked for an attorney during the interview.

Defendant testified on direct as follows about asking for an attorney:

Q       Okay. Did there come a time when you stated something about legal counsel?

A       Yes.

Q       And when you stated this, how long into the interview were you?

A       Probably 30 to 45 minutes into the interview.

Q       And what did you state about legal counsel?

A       The second time they asked me to point out a customer on the board, I said, "Guys, I think this is where I need to take a step back and see if I can get somebody from our legal department to guide me through these questions."

Q       And did you then indicate you were talking about a lawyer that worked for the company?

A       Yes.

. . .

Q       So when you said something about company counsel, what was the response that you got from the agents?

A       They said, "You watch too much TV. It doesn't work like this. We're the federal government."

(Doc. 177 [Wombold Tr.] at 256–57.)   On cross examination, Defendant testified as follows regarding his statement:

13

| A | I asked them to let me go get somebody to help guide me through the questions. |
| --- | --- |
| Q | That's different from what you just said on direct. Is it not? |
| A | No. I don't feel like it is. Again, I'm paraphrasing what I said. I asked them to allow me to go get somebody from our legal department to help guide me through the questions. |
| Q | You're claiming that you said that specific phrase? |
| A | Yes. |
| Q | I want to go to my legal department and get a lawyer? |
| A | I did not say "I want to get a lawyer." |
| Q | Okay. |
| A | I said I wanted to go get somebody from our legal department to help guide me through the questions, because I felt like they were getting a little more accusatory. |

(*Id.* at 283–84.)

Agent Fisher and Agent Masterson both testified that Defendant never asked for or mentioned a lawyer.  (Doc. 177 [Fisher Tr.] at 70, [Masterson Tr.] at 149.)

Defendant argues the Magistrate Judge's rejection of his testimony that he asked to be allowed to consult a lawyer is erroneous because it is based on the Magistrate Judge's misinterpretation of his testimony that he did not use the phrase "I want to get a lawyer." (Doc. 186 [Def.'s Obj.] at 12.)  Defendant points out that immediately before and after saying he did not use that specific phrase, he testified that he asked to be allowed to get someone from Pilot's legal department to help guide him through answering the questions.

The Magistrate Judge not only heard all of this testimony at the hearing, but he also referred in the R&R to both of these components of Defendant's testimony. In summarizing Defendant's testimony on this issue, the R&R states:

> Wombold said that he told the agents that he "wanted to go get somebody from our legal department to help guide me through the questions[.]" [Tr. at 284] He said he made this comment because the agents' questions were becoming "a little more accusatory." [Tr. at 284] He stated that he did not say that he wanted to get a lawyer. [Tr. at 284]

(Doc. 180 [R&R] at 29.) The Court sees no indication the Magistrate Judge misinterpreted Defendant's testimony that he did not use the phrase "I want to get a lawyer" as an admission that he never asked to be allowed to get legal help of any kind. Rather, the Magistrate Judge rejected Defendant's testimony because he found more credible Agent Fisher's and Agent's Masterson's testimony that Defendant made no such request. Given the Magistrate Judge's opportunity to observe and hear the witnesses and assess their demeanor, *see Moss*, 286 F.3d at 868, the Court gives deference to the Magistrate Judge's assessment of the witnesses' credibility.

**B.    The Weight Given to Three Specific Circumstances**

Defendant next objects to the weight the Magistrate Judge gave to three circumstances in considering whether Defendant was in custody. First, he argues the R&R understates the significance of the agents' forcing Pilot employees to hold their hands in the air for at least fifteen minutes at the beginning of the search. Second, he objects to the R&R's alleged erroneous conclusion that Defendant could not see other agents through the opening of the door during his interview. Third, he objects that the R&R's custody analysis discounts the importance of the agents' control over him as demonstrated by Agent Fisher's reaction when Defendant put his hands under his desk.

### 1. The Significance of Pilot Employees Holding Their Hands Up for at Least Fifteen Minutes

Defendant argues the R&R understates the significance of the agents' forcing Pilot employees to hold their hands in the air for at least fifteen minutes while they secured the area at the beginning of the search. The R&R describes this show of authority as "short-lived." (Doc. 180 [R&R] at 40.) Defendant argues that although there was nothing wrong with the agents having people hold their hands up while the agents secured the space, the effect of this striking circumstance "would naturally linger" for a reasonable person in Defendant's position. (Doc. 186 [Def.'s Obj.] at 17.) Defendant also relies on testimony from witnesses who were told to hold their hands up that they did not feel free to leave even after they had lowered their hands, until they were told they could go.

The Government responds that Defendant is the one who chose the office building where this show of authority had taken place as the location for his interview. (Doc. 195 [Gov't's Resp.] at 7.) The R&R found the agents "told Wombold that they could interview him there in this office, or they could move to another location, such as a restaurant or his home, to talk." (Doc. 180 [R&R] at 32.) Later in the interview, Agent Fisher again "offered to move to another location of Womobold's choosing. Wombold declined this offer."[10] (*Id.*) The Government argues that Defendant did not object to these findings, and he accordingly should not fault the

---

[10] The R&R finds this offer took place approximately an hour and a half into the interview. (Doc. 180 [R&R] at 32.) Based on the Court's review of the testimony, this second offer to change locations took place approximately halfway through the interview. Agent Fisher testified the second offer took place "[a]pproximately half hour, little longer into the interview," or around 2:55 p.m.. (Doc. 177 [Fisher Tr.] at 69.) Agent Masterson testified it happened "[a]bout halfway through the interview." (Doc. 177 [Masterson Tr.] at 146.) The R&R will be **MODIFIED** to reflect that the second offer to change locations took place approximately halfway through the interview.

16

R&R for not determining the location of the interview supports a finding that Defendant was in custody at the time of the interview.

The Court sees no error in the R&R's consideration of this circumstance. A reasonable person would indeed likely be struck by witnessing such a show of authority, and the Court agrees it would not be immediately forgotten. But it is also reasonable that the effect would be less on one who stood nearby watching for a period of time trying to figure out what was going on, as Defendant testified he was doing, than on one who was an actual participant. The testimony of the witnesses who actually did have to hold their hands up is therefore not directly relevant to determining what a reasonable person in Defendant's position would have felt. Further, there is no reason to conclude those witnesses' later feelings of constraint resulted from their having had to hold their hands up earlier, rather than from the fact that agents were still present, searching their workplace and interviewing their coworkers. In addition, it is reasonable to conclude that the effect of witnessing such a sight would begin to diminish as time passed. Defendant, on the other hand, testified the interview started out cordial and voluntary, and he became more uncomfortable as it went on and as the agents' questioning became more aggressive, until he ultimately began to question within himself whether he would be allowed to leave at the end of the interview. (*See, e.g.*, Doc. 177 [Wombold Tr.] at 284–85.).

Finally, the Court observes that,

> while any encounter with law enforcement officials may have "coercive aspects to it, simply by virtue of the fact that the [official] is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," investigators "are not required to administer *Miranda* warnings to everyone whom they question," and a "noncustodial setting is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive atmosphere.

*Panak*, 552 F.3d at 471 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)) (alteration in original). Defendant may have felt pressure to speak with the agents, knowing and having seen their authority as law-enforcement officers, but this does not equate to a restriction on his freedom of movement by those agents during his interview. *See id.* ("The question in the end is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them.")

The Court agrees with the R&R's conclusion that Defendant's having witnessed other Pilot employees holding their hands in the air for at least fifteen minutes does not, when combined with the other circumstances of Defendant's interview, indicate there was a restraint on Defendant's freedom of movement to the degree associated with a formal arrest.

### 2. The Significance of Defendant's Being Able to See Agents Through His Office Door

Defendant argues the R&R erred in concluding Defendant could not see other agents through the opening of his office door during his interview and accordingly also erred in failing to place any weight on this fact in considering all of the circumstances. Defendant argues leaving his door open "would have affected a reasonable person by revealing the risk of being confronted with armed agents had the person dared to try to get up and leave the office" and "highlighted that agents were in complete control of the premises and the employees." (Doc. 186 [Def.'s Obj.] at 19.) The Government does not respond to this objection.

The part of the R&R's analysis to which Defendant refers states as follows:

Of the fifty-four law enforcement officers participating in the execution of the search warrant at Pilot headquarters, around twenty came to Wombold's floor. Of those twenty, only Agents Fisher and Masterson went with Wombold to his office to conduct the interview. Although Wombold's door remained partially open during the interview, Wombold did not claim **to see other agents through the opening or** that an agent was guarding his door.

18

(Doc. 180 [R&R] at 39–40 (emphasis added).)  Defendant testified that he could see "[a] lot of people moving around, agents with employees going back and forth and people still with their hands intertwined on their head" through the opening in the door for the first fifteen or twenty minutes of the interview.[11]  (Doc. 177 [Wombold Tr.] at 247.)  The R&R also notes elsewhere Agent Fisher's acknowledgment "that Wombold could have seen agents passing by in the hallway because the door remained open about six inches during the interview." (Doc. 180 [R&R] at 11.)

Having reviewed the R&R, the relevant testimony, and Defendant's argument, the Court concludes that the purpose of the above-quoted portion of the R&R was to analyze the number of agents interacting with Defendant during the interview—two, despite the higher number of agents involved in the search—and to consider whether, for example, any other agents were restricting Defendant's freedom of movement during the interview.  *See, e.g.*, *United States v. Mahar*, 801 F.2d 1477, 1500 (6th Cir. 1986) (interview custodial where, among other factors, defendant was questioned in a small room while other agents stood guard outside the door).  In the portion of the R&R analyzing codefendant Jones's motion to suppress, the Magistrate Judge made a detailed comparison between the facts of Jones's interview and the facts in *Mahar*, including the statement "agents did not guard the door to the office during Jones's interview." (Doc. 180 [R&R] at 45.)  The Court concludes the Magistrate Judge was making a similar analysis in Defendant's case.  The Court also concludes that Defendant's ability to see agents walking past his slightly open door at times during his interview does not change the result of the

---

[11] Defendant later specified that he could see three of four people with their hands up during this time.  (Doc. 177 [Wombold Tr.] at 268–69.)

R&R's analysis.[12]  For the sake of clarity, however, the R&R will be **MODIFIED** at pages 39

through 40 to remove the phrase "to see other agents through the opening or," so the sentence

will read "Wombold did not claim that an agent was guarding his door."

### 3. The Significance of Agent Fisher's Reaction When Defendant Put His Hands Under His Desk

Defendant argues the Magistrate Judge erred by unduly minimizing the impact of the

following findings:

> At one point during the interview, Agent Fisher told Wombold that he did not
> believe Wombold was being candid with him. Wombold leaned forward and
> lowered his hands below the desk. Agent Fisher told Wombold to show his hands.
> Agent Fisher then stood, walked around the desk, and looked under it to make
> sure that Wombold did not have a weapon. After determining that Wombold did
> not have a gun, Agent Fisher returned to his chair and continued the interview.

(Doc. 180 [R&R] at 41.)  Defendant argues Agent Fisher "closely monitored and impeded

Wombold's freedom of action by dictating what Wombold could and could not do with his hands

and by physically invading Wombold's space behind his desk without invitation."  (Doc. 186

[Def.'s Obj.] at 19.)  This, Defendant argues, would indicate to a reasonable person in

Defendant's position that the agents were in complete control over him or her.

The Government responds that if a pat-down does not constitute custody for *Miranda*

purposes, a momentary check for weapons that does not even involve a pat-down cannot

constitute *Miranda* custody, either.  (Doc. 195 [Gov't's Resp.] at 8 (citing *United States v.*

*Patterson*, 826 F.3d 460, 457 (7th Cir. 2016) ("A *Terry* stop does not constitute custody for

---

[12] Questioning in a public place "both reduces the ability of an unscrupulous policeman
to use illegitimate means to elicit self-incriminating statements and diminishes the [detainee's]
fear that, if he does not cooperate, he will be subjected to abuse." *United States v. Swanson*, 341
F.3d 524, 529 (6th Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984)).
Although Defendant was not questioned in a public place, the same rationale applies to a lesser
degree where Defendant was questioned with multiple coworkers in the area beyond his partially
open door.

*Miranda* purposes . . . [and] we have repeatedly held that a pat-down search does not establish custody for *Miranda* purposes.")).) The Government also relies again on the fact that the agents made multiple offers to move the interview to a different location to show there was no *Miranda* custody.

The Magistrate Judge did not give improperly low weight to this incident in his analysis. Although no doubt intimidating to the subject of the interview, a brief interruption for a law enforcement officer to ensure that the subject is not reaching for a weapon does not make the whole interview custodial under these circumstances. *Cf. Salvo*, 133 F.3d at 959 ("[B]ecause of the very cursory and limited nature of a *Terry* stop, a suspect is not free to leave, yet is not entitled to full custody *Miranda* rights.")

## C. The Magistrate Judge's Recommendation

Defendant's final argument is that even if the Court rejects his specific objections, as it has done above, the facts as found in the R&R still tip in favor of a finding of custody. However, the Court must provide *de novo* review only to specific objections, not to conclusive or general ones. *See Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (district court need not provide *de novo* review where objections to a report and recommendation are frivolous, conclusive, or general). This rule comports with the judicial-efficiency rationale for permitting such objections to be raised in the district court: it "provides the district court with the opportunity to consider the specific contentions of the parties and to correct any errors immediately." *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). Raising a general objection to the entirety of the magistrate judge's analysis subverts this goal. "The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless." *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505,

509 (6th Cir. 1991). Defendant's general objection to the Magistrate Judge's conclusion is therefore not entitled to *de novo* review.

The Court nevertheless has reviewed the Magistrate Judge's analysis and agrees with it. The circumstances do not support a conclusion that there was a restraint on Defendant's freedom of movement of the degree associated with a formal arrest.

In this regard, Defendant's strong emphasis on the argument that a reasonable person in his position would not have "felt free to leave" misses the mark in two subtle but significant ways. (*See, e.g.*, Doc. 186 [Def.'s Obj.] at 7 (describing relevant inquiry as "specifically, would a reasonable person have felt free to leave?").) First, this factor is not the be-all and end-all of the inquiry: "[a]lthough the 'felt free to leave' inquiry may be a factor for consideration, the 'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Swanson*, 341 F.3d at 531 (quoting *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (internal citations omitted). Second, this factor more properly addresses not whether a reasonable person would have felt free to get up in the middle of questioning and walk out the door, but whether "a reasonable person would have felt free "***to terminate the interview*** and leave." *Panak*, 552 F.3d at 468.

Here, the Court concludes a reasonable person in Defendant's position would have felt free to tell the agents he was not going to answer any more questions and he wanted to leave. Defendant agreed to talk to two agents when asked. He was told he was not under arrest and did not have to answer any questions. He was told he could choose the location of his interview and he chose to stay in his own windowed office, behind his own desk, and with the door slightly open. He had physical access to his own cell phone, and although he was asked not to answer several calls and complied, he did answer a second call from his wife and speak to her briefly

during the interview.  He saw no weapons or violence during the search or interview, and he witnessed no show of force other than the initial securing of the office—during which he was not ordered to do anything and did not himself raise his hands—and a brief, albeit tense, few moments when an agent thought he was reaching for a weapon and came behind his desk to check.  The interview lasted approximately two hours, during which he was asked a second time if he wanted to move to a different location of his choosing.  As stated in *Panak*, "[t]he question is not whether [Defendant] felt pressure to ***speak*** to the [agents] but whether [he] was forced to ***stay*** with them.  No such showing was made here."  552 F.3d at 471.


### IV.	CONCLUSION

After reviewing the record, the Court finds the Magistrate Judge properly concluded Defendant was not in custody for *Miranda* purposes.  Accordingly, the Court will **MODIFY** the R&R as set out in this Memorandum and **ACCEPT** and **ADOPT** the remainder of the R&R (Doc. 180).  Defendant's motion to suppress (Doc. 132) will be **DENIED**.

**AN APPROPRIATE ORDER WILL ENTER.**


*/s/*_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**